The STATE of Delaware, Plaintiff Below, Appellant,

v.

Andre Stanley DEPUTY, Defendant Below, Appellee.

Supreme Court of Delaware.

Submitted Jan. 26, 1981.*

Decided July 21, 1981.

Dana C. Reed, Deputy Atty. Gen., Dover (Argued), for plaintiff-appellant.

Dean C. Johnson, Dover (Argued), for defendant-appellee.

Before DUFFY, McNEILLY and QUILLEN, JJ.

QUILLEN, Justice:

This is an appeal from a Superior Court order suppressing evidence in a murder prosecution. The appeal arises under our statute which permits the State to appeal in criminal cases under certain circumstances.[1] The pertinent facts are as follows:

---

* The appeal was argued on November 10, 1980 but certain procedural matters required by this Court were not accomplished until the date indicated.

1. 10 *Del.C.* § 9902(b) and (c) read as follows: "(b) When any order is entered before trial in any court suppressing or excluding substantial and material evidence, the court, upon certifi-

On February 7, 1979, the Delaware State Police began investigating the brutal murders of Bayard and Alberta Smith, an elderly couple found stabbed to death in their own home. The nature and severity of the crime indicated to the police that more than one killer may have been involved. Within hours the police obtained probable cause to arrest one William Henry Flamer.[2] While processing Flamer's arrest warrant, the police received information concerning Flamer's immediate whereabouts. Acting on this information, the police found Flamer, defendant-appellee Andre Deputy, and a third adult male walking on the shoulder of a highway. All three were stopped, frisked, and given *Miranda* warnings. Flamer was arrested. When asked his name and where he was from, Deputy responded in what the police described as an "evasive" manner. While the police did not know it at the time, Deputy in fact lied about his identity. Because of his unsatisfactory responses to the questions, the nature of the crime, and his conceivable involvement with Flamer, the police took Deputy to the Troop 5 police station for further questioning. Flamer and the third person were also taken to Troop 5. The police specifically "detained" Deputy and the third person. As distinct from Flamer, the police did not purport to arrest them.

At Troop 5, the police placed the three men in separate offices for questioning. Detective Porter, after giving Deputy *Miranda* warnings, found on Deputy a wallet belonging to one of the victims, two watches (one of which was later identified as one of the victims'), and a sum of money. At this moment, if not before, in another room, Flamer implicated Deputy in the murder. Detective Callaway, who had been

interrogating Flamer, then arrested Deputy for murder in the first degree. Later, Flamer told Detective Porter that Deputy was wanted for a prior murder in Wilmington. Detective Chaffinch confirmed this with the Wilmington police and arrested Deputy as a fugitive from the City of Wilmington.

The following day, February 8, 1979, after signing a waiver of rights, Deputy took a polygraph test, which indicated that he was not telling the truth with respect to his involvement in the murder. After the testing, the police questioned Deputy again, at which time he admitted that he was present in the victims' home when, according to Deputy, Flamer stabbed Mr. Smith. Sometime during the middle of the day, Deputy was taken before a magistrate and arraigned. At approximately 9:00 p. m. on the same day, after again receiving *Miranda* warnings, Deputy made a taped statement in which he admitted killing Alberta Smith.

Deputy was subsequently indicted for murder in the first degree, possession of a deadly weapon during commission of a felony, robbery in the first degree, and theft-felony. By letter opinion, the Superior Court suppressed, among other things, the wallet, watches, and cash found on Deputy, as well as the statements made by him on February 7th and 8th, determining that, among other things, he was wrongfully detained under 11 *Del.C.* § 1902 "because there was no reasonable basis to suspect that he had committed, was committing, or was about to commit a crime." The case was dismissed after the State certified that this evidence was essential for Deputy's prosecution. The State has appealed from that portion of the suppression order relat-

cation by the Attorney General that the evidence is essential to the prosecution of the case, shall dismiss the complaint, indictment or information or any count thereof to the proof of which the evidence suppressed or excluded is essential. Upon ordering the complaint, indictment or information or any count thereof dismissed pursuant to the Attorney General's certification, the reasons of the dismissal shall be set forth in the order entered upon the record.

"(c) The State shall have an absolute right of appeal to an appellate court from an order entered pursuant to subsection (b) of this section and if the appellate court upon review of the order suppressing evidence shall reverse the dismissal, the defendant may be subjected to trial."

2. Flamer has been tried and convicted of those killings. The case is on appeal. *Flamer v. State*, No. 60, 1980.

ing to the property found on Deputy and his statements. We confine our opinion to the lawfulness of the detention.

The State disputes the Superior Court's decision and contends that, under § 1902, the police had reasonable grounds to suspect Deputy's involvement in the murder, and that he was properly detained when his answers in response to questioning were unsatisfactory.

Deputy maintains that no reasonable basis to suspect existed for his initial stop and, accordingly, the subsequent evidence is inadmissible as "fruits of the poisonous tree". Deputy also argues that his detention was violative of the rule stated in *Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979), which excludes evidence obtained from custodial questioning undertaken without probable cause.

In 1951, Delaware enacted the Uniform Arrest Act which included the current 11 *Del.C.* § 1902. 48 *Del.Laws,* c. 304. This is a special provision of the Act, herein sometimes referred to as the detention statute, which deals with the questioning and detaining of suspects. It reads as follows:

"§ 1902. Questioning and detaining suspects.

(a) A peace officer may stop any person abroad, or in a public place, who he has reasonable ground to suspect is committing, has committed or is about to commit a crime, and may demand of him his name, address, business abroad and where he is going.

(b) Any person so questioned who fails to identify himself or explain his actions to the satisfaction of the officer may be detained and further questioned and investigated.

(c) The total period of detention provided for by this section shall not exceed 2 hours. The detention is not an arrest and shall not be recorded as an arrest in any official record. At the end of the detention the person so detained shall be released or be arrested and charged with a crime."

It seems clear to us from the face of the statute alone that the standard of "rea-sonable ground to suspect" was intended as a lesser standard than "probable cause to arrest". Subsection (b) makes it clear that the seizure contemplated may be investigatory. Subsection (c) makes it clear that it was expressly contemplated that there may not be sufficient grounds to arrest the person detained. Moreover, the context of the whole Uniform Arrest Act emphasizes the lesser standard for detention, as an arrest is lawful when there is "reasonable ground to believe" the person has committed a crime. 11 *Del.C.* § 1904.

While the language of the statute is clear on its face, our conclusion as to the lesser standard is reinforced by a contemporaneous written expression by the reporter of the committee who drafted the Act. See Warner, *The Uniform Arrest Act,* 28 Va.L. Rev. 315 (1942). That article, which seems incredibly current and reflective of good common sense, makes it clear that the very purpose of the detention statute was to legalize, without probable cause, the questioning and detention of persons where the express criteria of the statute are met. See Warner, *supra,* 28 Va.L.Rev. at 320–24.

Unfortunately, isolated case law has not been as precise on this threshold point as seems clear to us today. In particular, this Court's opinion in *DeSalvatore v. State,* Del.Supr., 163 A.2d 244, 248–49 (1960) has caused some confusion. It equated "reasonable ground to suspect" with "reasonable ground to believe". The passing comments in that case, totally unnecessary to the decision (because "reasonable grounds to believe" were found, 163 A.2d at 249), were made without detailed scrutiny of the statutory language or its history. For other confusing language, see *Wilson v. State,* Del.Supr., 109 A.2d 381, 390 (1954).

We do not think, however, that there has been any confusion as to the meaning of the statute in practice over the years. Our Court has repeatedly distinguished detention under the detention statute from a probable cause arrest. See *Cannon v. State,* Del.Supr., 168 A.2d 108, 109–10 (1961) where arrest and detention are dis-

tinguished; *Jarvis v. State*, Del.Supr., 224 A.2d 596, 598 (1966) where defendant, because not abroad, was arrested rather than detained; *State v. Bowden*, Del.Supr., 273 A.2d 481, 483 (1971) where detention and arrest, and the statutory standard attached to each, are distinguished as separate ways to apprehend without a warrant; *Lewis v. State*, Del.Supr., 305 A.2d 617, 618 (1973) where a pre-arrest protective search was made while suspects were detained under § 1902; *Young v. State*, Del.Supr., 339 A.2d 723, 724–25 (1975) where suspects were detained with "sufficient justification", but "released without arrest" at the end of the two-hour detention period, and where a television set seized when the suspects were detained was suppressed for want of probable cause; *Cook v. State*, Del.Supr., 374 A.2d 264, 266 (1977) where weapons frisks of defendants detained under the detention statute were upheld; *Foraker v. State*, Del.Supr., 394 A.2d 208, 213 (1978) where an apprehension, not a detention under § 1902 because the defendant was not "stopped while travelling abroad", was nevertheless upheld as an arrest since "reasonable grounds to believe defendant committed a felony" existed. See also *State v. Smith*, Del.Super., 91 A.2d 188, 190 (1952) where defendant was detained but not arrested; *State v. Klinehoffer*, Del.Super., 173 A.2d 478, 480 (1961) where defendant was arrested, not detained; *State v. De Koenigswarter*, Del.Super., 177 A.2d 344, 346* (1962) where "a person detained for questioning must be arrested or released at the end of two hours"; *State v. Moore*, Del.Super., 187 A.2d 807 (1963) where the concepts of "stops", "frisks", and "arrests" were examined at some length; *State v. Lynch*, Del. Super., 274 A.2d 443, 445 (1971) where it was noted, citing the statute, that our law recognizes situations where an "arrest is not required for a detention"; *State v. Wrightson*, Del.Super., 391 A.2d 227, 229 (1978) where detention and arrest were examined separately in determining that evidence should be suppressed; and *Stewart v. State*, Del.Supr., 409 A.2d 1052, 1055 (1979) where a detention followed by a pat-down search was upheld as "alert and commenda-

ble police action". In short, our case law clearly establishes that the "reasonable ground to suspect" language in § 1902 is a lesser standard than probable cause.

■ The Court below stated that "it was not proper to detain Deputy under 11 *Del.C.* § 1902 because there was no reasonable basis to suspect that he had committed, was committing, or was about to commit a crime". We cannot accept this conclusion, which we find clearly erroneous.

We review the circumstances of Deputy's detention. The police were investigating a truly heinous crime. Detective Callaway, one of the first officers at the murder scene, testified that it appeared to him that more than one murderer may have been involved, due to "[t]he nature of the crime, how severe it was and the multiple stab wounds that each victim had." Consequently, when he and Detective Porter went to arrest Flamer, they were under the impression that not only were they looking for a brutal killer, but also that another killer, or several, might be at large as well.

They found Flamer, who was subject to arrest for the murders, on a roadside walking with Deputy and a third male. Thus, Deputy was in Flamer's immediate company hours after the crime had been discovered. "[A] person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person." *Ybarra v. Illinois*, 444 U.S. 85, 91, 100 S.Ct. 338, 342, 62 L.Ed.2d 238, 245 (1979) (citation omitted). Nor does it give rise to probable cause to arrest that person. But one's company with a suspected felon soon after the offense is undeniably a factor to consider when determining reasonable suspicion. A person, may, in some circumstances, be judged by the company he keeps. It undoubtedly entered into the arresting officers' minds as they found Deputy with Flamer. Moreover, the officers were understandably concerned for their own safety. They properly frisked all three men. When asked his name, Deputy replied, "Ray Anderson", in what Detective Porter described as an "evasive" manner. When

asked where he was from, Deputy replied, "Harrington". Harrington is Porter's home town. Porter testified that he had lived in Harrington all of his life, that he knew most of the people in Harrington by name or by sight, and that he was not satisfied with Deputy's answers. At this point Porter decided to take Deputy to Troop 5 for further questioning. We believe there was reasonable cause to suspect that Deputy had committed a felony. The police were looking for one or more killers. They had probable cause and a warrant for Flamer. They found Deputy in Flamer's immediate company shortly thereafter. When questioned, Deputy responded in what a trained detective with over six years' police experience termed an evasive manner. (Indeed, it was later determined that that detective was right since Deputy in fact lied.) We conclude that these circumstances, when considered as a whole in the context of that day, amounted to reasonable cause to suspect Deputy had committed a felony.

■ In sum, the police, under the well-established Delaware practice sanctioned by § 1902, believed they were acting properly when "detaining" Deputy, i. e., taking him to Troop 5 for further investigation. Nearly four months later, however, the United States Supreme Court, in *Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979), determined that detention for custodial interrogation without probable cause violates the Fourth and Fourteenth Amendments of the United States Constitution. As the opinion of the Court states, however, " 'the question of the legality of custodial questioning on less than probable cause for a full-fledged arrest' " had been reserved (and therefore unanswered) at least since *Morales v. New York*, 396 U.S. 102, 106, 90 S.Ct. 291, 293, 24 L.Ed.2d 299, 302 (1969). Clearly, Deputy was detained for a custodial interrogation. Moreover, Deputy was detained on less than probable cause—i. e., on a reasonable suspicion of crime. But we believe the police conduct in this case was proper because our reading of a recent Supreme Court case on retroactivity, *United States v. Peltier*, 422 U.S. 531, 95 S.Ct. 2313, 45 L.Ed.2d 374 (1975), produces

the conclusion, under the circumstances in Delaware, that *Dunaway* is non-retroactive. *Peltier* teaches that the exclusionary rule is not intended to suppress evidence obtained by prevailing constitutional practices preceding an opinion condemning such practices. Detention under the detention statute was considered proper in Delaware before *Dunaway*.

Until *Peltier*, there appeared little doubt that as a threshold to retroactivity analysis the case whose question of retroactive application was at issue must have been one constituting a "sharp break" from earlier authority—one deciding a *new* principle of law. And Justice Rehnquist in *Peltier* expressly qualifies his discussion of the retroactivity of constitutional doctrines to only those that are "new". See 422 U.S. at 535, 538, 95 S.Ct. at 2316, 2318, 45 L.Ed.2d at 379–80, 382. Two of the dissenting Justices in *Peltier*, however, believed that the majority discarded the threshold requirement by presuming that all exclusionary rule cases will have non-retroactive application. 422 U.S. at 550, 95 S.Ct. at 2324, 45 L.Ed.2d at 388–89 (Brennan, J., dissenting). See also *State v. Carpentieri*, N.J.Supr., 82 N.J. 546, 414 A.2d 966, 968 (1980). We need not focus on that difference in this case. We conclude that *Dunaway* in fact expressed a "new" constitutional principle, at least in the sense of providing a reply to a long-unanswered question—that "of the legality of custodial questioning on less than probable cause...." *Dunaway*, 442 U.S. at 202, 99 S.Ct. at 2251, 60 L.Ed.2d at 829. Section 1902, with a basis at common law, was considered constitutional when originally drafted. See Warner, *supra*, 28 Va.L.Rev. at 317–24. As noted, it has had an independent status in Delaware over the years. Accordingly, whatever the situation may be elsewhere, *Dunaway*, with respect to § 1902 in Delaware, announced a "new" constitutional rule. Compare, *United States v. Tucker*, 2d Cir., 610 F.2d 1007 (1979). *Peltier* states that "[i]f the purpose of the exclusionary rule is to deter unlawful police conduct, then evidence obtained from a search should be suppressed only if it can be said

that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment." 422 U.S. at 542, 95 S.Ct. at 2320, 45 L.Ed.2d at 384.

The officers that detained Deputy had every reason to believe that their detention of Deputy was permissible. Accordingly, it seems to us that *Peltier* clearly directs that *Dunaway* should not be retroactively applicable, and the custodial interrogation in this case was proper. See also *People v. Wise,* N.Y.Supr., 104 Misc.2d 77, 427 N.Y.S.2d 691 (1980).

Admittedly, the retroactivity issue becomes more difficult if one views *Dunaway* without the limited context of the exclusionary rule. Regardless of whether one is sympathetic to the opinion of the Court or the dissent, *Dunaway* in a broad sense is directed "to the protection of a citizen's privacy". *Dunaway,* 442 U.S. at 213, 99 S.Ct. at 2256, 60 L.Ed.2d at 836. It is a fundamental liberty interest. While "the extent of the reliance by law enforcement authorities on the old standards" and "the effect on the administration of justice of a retroactive application of the new standards" here strongly support nonretroactivity, it is "the purpose to be served" by the new constitutional rule which is the foremost factor. *Brown v. Louisiana,* 447 U.S. 323, 328, 100 S.Ct. 2214, 2219, 65 L.Ed.2d 159, 165 (1980). If one gets beyond the evidentiary focus of the exclusionary rule, there is indeed a strong argument for retroactive effect of the liberty interest in this case. But, given the Delaware statute, including its express limitations on police conduct, and the prior express reservation by the United States Supreme Court of the question decided in *Dunaway,* we cannot say that even the fundamental liberty purpose of the rule "clearly" favors retroactivity. *Brown,* 447 U.S. at 328, 100 S.Ct. at 2219, 65 L.Ed.2d at 165. In light of the

published statutory standard prior to *Dunaway,* the citizen in Delaware had no legal basis for an expectation that his privacy would not be infringed upon in accordance with the statutory standard. Moreover, the police had a duty to protect the public and to investigate reasonably under the standards permitted by law, including the detention statute. Finally, this new constitutional doctrine as applied here is not designed to correct a deficiency in the truthfinding function of the criminal process. See cases cited in *Brown,* 447 U.S. at 328, 100 S.Ct. at 2220, 65 L.Ed.2d at 166. Indeed, absent abusive conduct by the police, the new rule may eliminate the opportunity to obtain the best evidence in the case. Thus, even under the broadest view, we find a weighing of the purpose of the new rule in its historic context, the reliance by the authorities on the old rule, and the impact of a retroactive application of the change on the administration of justice supports a non-retroactivity conclusion.

There are other legal issues presented but we do not reach them because they present mixed questions of fact and law which should be determined in the Trial Court. We determine only that the custodial interrogation of the defendant on February 7, 1979 under the detention statute was proper even though the police did not have probable cause to arrest Deputy on the Smith homicides.

We add by way of dictum that, while *Dunaway* may appear to invalidate a future Delaware custodial interrogation at the police station under the circumstances of this case, it should be noted that *Dunaway* did not involve a statute imposing limiting standards on such investigative custodial interrogation.[3] It has sometimes been suggested in the *Miranda* and exclusionary rule area that statutes giving adequate safeguards might make a difference. Whether our statute would make a difference here

---

**3.** We are not without sympathy for the view expressed in the concurrence that *Dunaway* does not invalidate the custodial interrogation in this case. But we cannot say with confidence that the United States Supreme Court

would view Deputy's detention as a "limited intrusion" not having "the essential attributes of a formal arrest". *Michigan v. Summers,* —— U.S. ——, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981).

may perhaps be mere speculation that may never be put to the test given the breadth of the *Dunaway* opinion. But it seems to us that the action taken in this case, insofar as the apprehension of Deputy is concerned, far from being "unreasonable", reflected alert and commendable police work. Therefore future developments in this area should be watched with care.

Insofar as the letter opinion in the Superior Court dated February 1, 1980 held that Deputy was wrongfully detained under the detention statute, we find error. Accordingly, the subsequent order dismissing the charges against Deputy pursuant to 10 *Del.C.* § 9902(b) is reversed and the case is remanded for further proceedings.

DUFFY, Justice, concurring:

I concur in the judgment of the Court and I agree with much of the opinion. But I am not persuaded that *Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979), requires the narrow reading which the Court implicitly gives it and, for that reason, I think it is unnecessary to consider whether *Dunaway* is to be given or is not to be given a retroactive application.

In *Michigan v. Summers*, —— U.S. ——, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981), the United States Supreme Court discussed *Dunaway* just last month. The Court made clear that *Dunaway* "reaffirmed the general rule that an official seizure of the person must be supported by probable cause, even if no formal arrest is made." But, said the Court,

"[a]lthough we refused in *Dunaway* to find an exception that would swallow the general rule, our opinion recognized that some seizures significantly less intrusive than an arrest have withstood scrutiny under the reasonableness standard embodied in the Fourth Amendment. In these cases the intrusion on the citizen's privacy 'was so much less severe' than that involved in a traditional arrest that 'the opposing interests in crime prevention and detection and in the police officer's safety' could support the seizure as reasonable."

After discussing *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *Adams v. Williams*, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972), and *United States v. Brigoni-Ponce*, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975), (all were cases involving "intrusions" on less than probable cause), the Court derived the followed principle from them:

"These cases recognize that some seizures admittedly covered by the Fourth Amendment constitute such limited intrusions on the personal security of those detained and are justified by such substantial law enforcement interests that they may be made on less than probable cause, so long as police have an articulable basis for suspecting criminal activity. In these cases, as in *Dunaway*, the Court was applying the ultimate standard of reasonableness embodied in the Fourth Amendment. They are consistent with the general rule that every arrest, and every seizure having the essential attributes of a formal arrest, is unreasonable unless it is supported by probable cause. But they demonstrate that the exception for limited intrusions that may be justified by special law enforcement interests is not confined to the momentary on-the-street detention accompanied by a frisk for weapons involved in *Terry* and *Adams.*"

In my view, the situation in which the police found themselves at the time Andre Deputy was stopped falls within that exception. Specifically, the police had "an articulable basis for suspecting criminal activity" and the limited intrusion on Deputy's personal security was justified by the substantial law enforcement interest that was at stake.

As the Court's opinion shows, the police were investigating the brutal murders of an elderly couple: the murders were first reported to the police at about 8:30 A.M. on February 7, a snowy day; the investigation led the police to the victims' house, to their abandoned automobile on a town street, to William Henry Flamer's residence, to a Justice of the Peace Court to secure a warrant

for Flamer's arrest and then to a search for Flamer. The warrant charged Flamer with the murders. There was reason to believe, on the basis of the investigation, that more than one killer may have been involved in the murders. Acting on a tip, at about 3:15 P.M. on February 7, the police found Flamer walking with Deputy (and a third man) on the shoulder of U. S. Route 13; the police stopped all three men and, when Deputy was asked his name and where he was from the police concluded (based on his demeanor) that his answers were "evasive." The police then took all men in to Troop 5 for questioning.

To paraphrase what Justice Stevens said in *Summers*, the limited intrusion outlined in those events is justified, in my judgment, by the special law enforcement interest at stake, that is, detaining Deputy when the police had reason to believe that the murders with which Flamer had been charged had been committed with one or more accomplices.

In short, in my opinion, the circumstances of the detention amount to an "articulable basis for suspecting criminal activity" by Deputy and justify the limited intrusion on his Fourth Amendment rights.* That intrusion required Deputy to go with the police from the public highway on a snowy February day to the Troop while the investigation was continued. The total "detention" time was less than two hours, the special law enforcement interest was high.

---

*There is a striking parallel in the factual circumstances in *Summers* and those shown by the record before us: in the former case the police had a warrant to search the house (but *not* the person of Summers who had been first found *outside* the house); here, the police had a warrant to arrest Flamer in whose company (on a public highway) Deputy was found shortly after the murders. In both cases, the critical

question is "whether the officers had the authority to require," —— U.S. ——, 101 S.Ct. 2587, 69 L.Ed.2d 340 the respective defendants to accompany them: in *Summers*, defendant was required to "re-enter the house and to remain there"; in this case, Deputy was required to accompany the police to the Troop and remain there.