**Winifred HARRISON, Defendant Below, Appellant,**

v.

**STATE of Delaware, Plaintiff Below, Appellee.**

Supreme Court of Delaware.

Submitted on Rehearing En Banc Oct. 19, 1981.

Decided March 18, 1982.

Brian P. Murphy (Argued), Middletown, for defendant below, appellant.

Alex J. Smalls, Deputy Atty. Gen. (Argued), Wilmington, for plaintiff below, appellee.

Before HERRMANN, C. J., DUFFY, McNEILLY, QUILLEN and HORSEY, JJ., constituting the Court en Banc.

McNEILLY, Justice (for the majority):

This appeal requires the Court to interpret and apply the Delaware Entrapment Statute, 11 *Del.C.* § 432,[1] as revised in 1974.

The defendant, Winifred Harrison, was convicted after trial by jury and sentenced on charges relating to her employment as a prison guard at the Smyrna Correctional Institution. The appeal is based upon the Trial Court's refusal to set aside the jury verdict and hold that entrapment had occurred as a matter of law.

I

The defendant was indicted on two counts of each of the following offenses: Receiving a Bribe (11 *Del.C.* § 1203); Delivery of a Non-Narcotic Schedule I Controlled Substance (16 *Del.C.* § 4752); Conspiracy Second Degree (11 *Del.C.* § 512); Official Misconduct (11 *Del.C.* § 1211); and Promoting Prison Contraband (11 *Del.C.* § 1256).

The defendant was a 32 year old woman, married, with one child, who did not drink, smoke, use drugs, or have a criminal record. At the time of the incidents in question, defendant had been employed at the prison for approximately two months.

The State Police were concerned about contraband, particularly drugs, being brought into the Smyrna Institution; a special police task force had been formed. This was a long-standing problem, pre-existing the defendant's employment by many years.

A prisoner, John Barlow, was concerned about the drug problem because he was a "long-termer". He wished to make the prison a better place in which to live and to ingratiate himself with the authorities. Shortly after the employment of the defendant, at a meeting with the police lieutenant involved in the task force, Barlow volunteered that, while he had no first-hand knowledge as to the identity of any guard bringing drugs into the prison, he would approach guards he had heard were doing so, and attempt to have them bring in drugs for him. At that time, Barlow named the defendant as one of the guards he would approach. Barlow testified that he singled out the defendant for the reason that the defendant was bringing food into the prison which was technical contraband and, therefore, a violation of prison rules and 11 *Del.C.* § 1256.

The plan of the police was for Barlow to give a guard the telephone number of his outside drug contact named Dennis, who, in fact, was the police lieutenant with the task force. Then, under the plan, when a guard called Dennis at Barlow's request, a meeting time and place would be arranged and Dennis would give the guard two ounces of marijuana to deliver to Barlow in the prison together with $100. for the guard's services.

Barlow approached the defendant and first suggested the subject of smuggling marijuana into the prison for him. He testified that defendant agreed to bring the drug into the prison for him after deliberating for only an hour or two, and that there was no pressure or threat of physical or emotional harm exerted upon her. According to the defendant's version of how she

---

1. 11 *Del.C.* § 432 provides:

"(a) In any prosecution for an offense, it is an affirmative defense that the accused engaged in the proscribed conduct because he was induced by a law-enforcement official or his agent who is acting in the knowing cooperation with such an official to engage in the proscribed conduct constituting such conduct which is a crime when such person is not otherwise disposed to do so. The defense of entrapment as defined by this Criminal Code concedes the commission of the act charged but claims that it should not be punished because of the wrongdoing of the officer originates the idea of the crime and then induces the other person to engage in conduct constituting such a crime when the other person is not otherwise disposed to do so.

(b) The defense afforded by subsection (a) of this section is unavailable when causing or threatening physical injury is an element of the offense charged and the prosecution is based on conduct causing or threatening such injury to a person other than the person perpetrating the entrapment."

was recruited into the scheme, Barlow approached her two or three times a week for a month, begging her to bring in drugs, but she rejected all of his pleas. Defendant related that Barlow would give her the telephone number of his contact on the outside to call, and she would lose it or tear it up, and he would write it out and give it to her again and again. The defendant further testified that she did not inform prison authorities of Barlow's behavior because she knew from experience that he could be punished severely and because he told her the second time she brought the drug into the prison for Barlow that, since he had promised it to other prisoners, she had to do it again for him or else he would be beaten up by the others for not delivering the drugs as promised.

The police lieutenant (Dennis) testified that, after the defendant telephoned him twice, three meetings were arranged: one at a public rest stop on a main highway near Smyrna; another at a restaurant on the same highway; and the third at the defendant's home near Smyrna. The officer stated that the defendant appeared nervous and on each occasion was given the opportunity to withdraw, but that she declined each time, stating that she wished to go through with the delivery. The lieutenant added that on two such occasions (separated by about a month) defendant received two ounces of marijuana and $100., delivered the drug to Barlow in the prison[2], and he, in turn, returned the drug to the police. The police officer testified that at no point did he exert force or pressure of any kind upon the defendant.

## II

At the trial, the defendant raised the affirmative defense of entrapment. On that issue, the Trial Court stated that it instructed the jury "under the provisions of 11 *Del.C.* § 432, in substantial accord with Suggested Uniform Jury Instruction (7U)".[3]

In reviewing the defendant's motion to set aside the jury's verdict, the Trial Court

---

**2.** The defendant devised the procedure for delivery to Barlow: she took the drugs into the Correctional Institution, and hid them under a heater in the guard's bathroom. Thereafter, she informed Barlow and unlocked the door so that he could retrieve them.

**3.** The pertinent text of the jury charge was as follows:

"I turn, then, to this much-referred-to defense of entrapment. The defendant has asserted as an affirmative defense in this case that the defendant engaged in the conduct charged to constitute the various offenses listed herein because she was induced to do so by the conduct of a law enforcement official or of the agent of a law enforcement official, the prisoner that testified.

This affirmative defense is known as entrapment. In order to establish the affirmative defense of entrapment, it is necessary for the defendant to satisfy you by a preponderance of the evidence of both the following elements: First, the defendant engaged in the conduct constituting the offenses or offense because she was induced to do so by a law enforcement official or by an agent acting under the auspices of the law enforcement official, acting (and that agent acting) in knowing cooperation with the official. And secondly it must be proven that the defendant was not otherwise disposed to engage in the conduct constituting the offenses.

You should be aware that the defense of entrapment concedes the commission of the acts charged, that is, the acts which would constitute crimes were it not for the defense of entrapment. But the claim is asserted that it should not have been punished or that it is unjust to punish any such criminal action because the officer, the law enforcement officer, or his agent, the prisoner, by his or their actions originated the idea of the crime, and induced the defendant to engage in conduct constituting the crime when the defendant was not otherwise disposed to do so.

The defense of entrapment does not apply to situations in which the law enforcement officers or their agents merely afford a defendant the opportunity to engage in conduct constituting a crime.

If you find from a preponderance of the evidence that the agent of the State, the prisoner, John Barlow, lured the defendant, otherwise innocent, into the commission of the crime or crimes, or that he put positive pressure on the defendant to commit the crime or crimes to which she had no prior disposition to commit, then the defendant has proved the defense of entrapment and the defendant is entitled to an acquittal.

\*   \*   \*   \*   \*   \*

And, if the defendant is to be acquitted on the affirmative defense of entrapment, however, the defense has the burden of proving that entrapment took place, but the burden is

recognized that the motion was based upon the contention that "it is entrapment as a matter of law when a police officer provides a defendant with marijuana and then the defendant merely 'acts as a conduit' and delivers the marijuana to a government officer or agent". The Trial Court also noted the defendant's assertion that should the Court not find this situation to be an entrapment as a matter of law, there was no evidence of a previous predisposition on the part of the defendant to commit the crime.

The Trial Judge concluded that, under § 432, the defendant's predisposition to commit the crimes charged was an issue of fact for the jury and that there was sufficient evidence on that issue to go to the jury. On that reasoning, the Trial Court denied the motion to set the jury verdict aside. The defendant appeals from that denial.

### III

The defendant contests the denial of her motion on three grounds: 1) that she was entrapped as a matter of law; 2) that she was denied due process of law through a conviction based upon overreaching and outrageous police conduct; and 3) that there was no evidence to show that she was predisposed to commit the crimes charged. Before proceeding to a consideration of these arguments, we find it necessary to explore pertinent decisions in this evolving area of the law.

The United States Supreme Court has addressed the issue of entrapment on four major occasions. In *Sorrells v. United States*, 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413 (1932), a majority of the Court held that the issue of entrapment was a question for the jury and adopted a legislative intent analysis on the issue. In *Sherman v. United States*, 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958), the majority promulgated a "subjective test" which focused on the

defendant's predisposition to commit the offense charged. In a concurring opinion penned by Justice Frankfurter, the majority's "subjective test" was rejected in favor of an "objective test" which emphasized the conduct of government agents. Under this test, a case would be dismissed on the basis of a successful entrapment defense where the conduct of government agents was likely to cause a person of reasonably firm moral character to commit the solicited offense.

In *United States v. Russell*, 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973), a majority of the Supreme Court continued to adhere to the subjective test for entrapment and declared that the defense of entrapment does not succeed where a predisposed defendant relies on the creative involvement of government agents. Dissenting opinions, however, embodied the objective test formulated by Justice Frankfurter in *Sherman*.

The Supreme Court dealt with the issue again in *Hampton v. United States*, 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed. 113 (1976). There, a plurality of the Justices[4] opined that a successful entrapment defense is precluded where the defendant is predisposed regardless of the outrageousness of police behavior. *Id.* at 490, 96 S.Ct. at 1650. The plurality stated that "the entrapment defense focus[es] on the intent or predisposition of the defendant to commit the crime . . . rather than upon the conduct of the government agent." *Id.* at 488, 96 S.Ct. at 1649, *quoting United States v. Russell*, 411 U.S. 423, 429, 93 S.Ct. 1637, 1641, 36 L.Ed.2d 366 (1974). The plurality left open the possibility that a defendant could succeed where he alleged and proved a violation of his own due process rights. *Hampton*, supra, 425 U.S. at 490, 96 S.Ct. at 1650. Two Justices concurred in the judgment, asserting that even a predisposed defendant could avoid conviction where the conduct of the government was intolerably outrageous.

by a preponderance of the evidence rather than beyond a reasonable doubt."

4. Justice Stevens did not participate in the decision.

*Id.* at 493, 96 S.Ct. at 1651 (Powell, J., dissenting). The three Justices who dissented found that the government's *conduct violated the defendant's constitutional right to due process* and would at a minimum engraft the [objective test] ... and hold that conviction is barred as a matter of law where the subject of the criminal charge is the sale of contraband provided to the defendant by a government agent." *Hampton*, supra, at 500, 96 S.Ct. at 1655. (Brennan, J., dissenting) (emphasis added).

From these Supreme Court decisions Judge Fullam, in *United States v. Jannotti*, E.D.Pa., 501 F.Supp. 1182, 1189 (1980), elucidated four "guiding principles" governing the issues of entrapment and violation of due process in an entrapment context.[5]

Those principles are the following:

"1. It is perfectly proper for law enforcement officials to engage in undercover activities, including deception and trickery, where both the purpose and effect of their activities is to enforce the law by ferreting out and exposing criminal activities. Entrapment issues arise only where the Government induces or persuades a person to commit a crime, or actually participates in the commission of the crime.

2. Under no circumstances is it permissible to convict of crime a non-predisposed defendant who was induced by government agents to commit the crime charged. No member of the Supreme Court has ever expressed any doubt as to the correctness of this principle, although varying reasons have been put forth from time to time for its justification.

3. A predisposed defendant may properly be convicted notwithstanding he was induced by government agents to commit the particular crime charged, so long as the inducement is not such as would be likely to cause a person of reasonably firm moral convictions to stray into criminality. For some members of the Court, this is true because, in their view, a predisposed defendant cannot successfully assert an entrapment defense under any circumstances. For other members of the Court, this is true because entrapment should be viewed as a matter of the objective reasonableness of the conduct of the government agents. Neither of these approaches is fully accepted by a majority of the Court. There is, however, ma-

5. In the District Court proceedings, a jury found defendants Jannotti and Schwartz guilty of conspiring to obstruct interstate commerce in violation of the Hobbs Act, 18 *U.S.C.* § 1951(a) and found defendant Schwartz guilty of conspiracy in violation of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 *U.S.C.* § 1962(d). However, the District Court, per Judge Fullam, entered an order setting aside the jury verdict in its entirety, dismissing Count III of the indictment (the Hobbs Act count) for want of jurisdiction, and granting the defendants' motions for judgment of acquittal. *United States v. Jannotti*, E.D.Pa., 501 F.Supp. 1182 (1980). In reaching his decision, Judge Fullam concluded that: (a) the evidence was insufficient to show an impact upon interstate commerce necessary to confer jurisdiction on the District Court under the Hobbs Act; (b) the evidence was sufficient to establish all of the elements of the RICO conspiracy charge contained in Count II of the indictment; (c) both defendants were entitled to judgments of acquittal because the evidence established entrapment as a matter of law; (d) alternatively, defendants were entitled to judgments of

acquittal on the ground that the government's conduct amounted to overreaching and a violation of due process; and (e) alternatively, the defendants were entitled to judgments of acquittal on the ground that the government artificially created the circumstances relied upon to create federal jurisdiction. *Id.* at 1205. The Third Circuit Court of Appeals reversed the District Court's decision and reinstated the jury's verdict on the ground that the lower Court "erred in its legal analysis" of the jurisdictional and due process issues and "usurped the function of the jury to decide contested issues of fact." *United States v. Jannotti*, 673 F.2d 578, at 581 (1980) (en banc). Specifically, the Third Circuit held that

"(1) there was jurisdiction under the Hobbs Act; (2) the evidence of defendants' predisposition was sufficient to support the jury's conclusion of no entrapment; (3) the conduct of the government agents as to Schwartz and Jannotti did not violate their due process rights; and (4) there was no basis on which to direct an acquittal on the ground of manufactured jurisdiction." *Id.* at 70 at 611.

jority acceptance of a middle ground, set forth in the following paragraph.

4. A predisposed defendant may properly be convicted notwithstanding governmental inducement or creative involvement, unless the conduct of the government agents was so outrageous as to violate fundamental concepts of fairness; that is, unless the conduct of the government agents was so outrageous as to be deemed a violation of due process.[6] The converse of this statement, namely, that even a predisposed defendant cannot be convicted if the Government's conduct amounted to a violation of due. process, probably also represents the view of a majority of the members of the Court, although some may regard it as still an open question, and it is probable that opinions concerning what is, and what is not, sufficiently outrageous conduct can be expected to vary." *Id.*

The Third Circuit Court of Appeals reversed the decision of District Court in *United States v. Jannotti,* 3d Cir., 673 F.2d 578, at 581 (1982) (en banc). In so doing, however, the Third Circuit implicitly sanctioned the Trial Court's analysis of the decisions of the United States Supreme Court in *Sorrells, Sherman, Russell* and *Hampton,* supra, by examining each of these cases and culling from them legal principles similar to those enunciated by Judge Fullam on the issues of entrapment and violation of due process in an entrapment context. See *United States v. Jannotti,* 673 F.2d at 596–598 & 606–608. Speaking to the defense of entrapment, and quoting from *Sorrells,* supra, at 441, the Court of Appeals stated: " 'It is well settled that the fact that officers or employees of the Government merely afford opportunities or facilities for the commission of the offense does not defeat the prosecution,' " *id.* at 597, and the Court of Appeals further stated that "[e]ntrapment occurs when a

defendant who was not predisposed to commit the crime does so as a result of the government's inducement. The entrapment defense thus focuses on 'the intent or predisposition of the defendant to commit the crime.' " *Id.* at 597, *quoting Russell,* supra, 411 U.S. at 429, 93 S.Ct. at 1641. The Court of Appeals in *Jannotti* also stressed this important point: "[A]lthough there may be instances where the undisputed facts establish the entrapment defense as a matter of law, as in *United States v. Sherman,* or where the evidence is simply insufficient to submit the issue to the jury . . . entrapment is generally a jury question," *id.* at 597 (citations omitted), and "the government has the burden to disprove the whole [entrapment] defense beyond a reasonable doubt." *Id., quoting United States v. Watson,* 3d Cir., 489 F.2d 504, 510 (1973).

In its discussion of the due process defense, which must not be permitted to "overlap with the entrapment defense", *id.* at 606, the Third Circuit Court of Appeals stated that the Supreme Court's opinion in *Russell* and the separate opinions in *Hampton* require "that a successful due process defense must be predicated on intolerable government conduct which goes beyond that necessary to sustain an entrapment defense." *Id.* at 607. The Court cautioned against confusing the Supreme Court's "consistent rejection of the objective test of entrapment by permitting it to reemerge cloaked as a due process defense," emphasizing that "the majority [of the United States Supreme Court] has manifestly reserved for the constitutional defense only the most intolerable government conduct," *id.* at 608, and that it must be borne in mind that the Supreme Court has made it clear that the statutory defense of entrapment and the constitutional defense of violation of due process are "separate and distinct" defenses. *Id.* at 606.

There appears to be no reported Delaware case law on the subject of entrapment

---

**6.** The Supreme Court has not yet disposed of a    case on this ground.

subsequent to the 1974 effective date of § 432. Our earlier decisions reflected a hybrid approach to the entrapment defense: Was there "evidence of luring or positive pressure upon a defendant to commit a crime as to which he had no prior disposition?" See, *Marvel v. State*, Del.Supr., 312 A.2d 318 (1973); *Crosby v. State*, Del.Supr., 295 A.2d 709, 710 (1972). On the other hand, "[t]he question to be asked was: 'With whom did the criminal design originate?'" *Dobrosielski v. State*, Del.Supr., 311 A.2d 875, 876 (1973).

The divergence of judicial opinion and the elasticity of the objective and subjective tests absent a statute like § 432 are further demonstrated by *State v. Talbot*, N.J., 71 N.J. 160, 364 A.2d 9 (1976), upon which the defendant places special reliance. The *Talbot* Court remarked:

"Ordinarily a defendant's predisposition to commit the crime is a relevant factor when the defense of entrapment is raised.... "[P]redisposition is evidenced by previous conviction of crime, reputation for criminal activities, ready compliance with minimal inducement, or easy yielding to the opportunity to commit the offense." However, as the part played by the State in the criminal activity increases, the importance of the factor of defendant's criminal intent decreases until finally a point may be reached where the methods used by the State to obtain a conviction cannot be countenanced, even though a defendant's predisposition is shown. Whether the police activity has overstepped the bounds of permissible conduct is a question to be decided by the trial court rather than the jury.

We hold that where an informer or other agent generally acting in concert with law enforcement authorities, furnishes a defendant with heroin for the purpose of then arranging a sale of the heroin by the defendant to an undercover officer, which sale is then consummated, defendant has been entrapped as a matter of law even though predisposition to commit may appear...."

*Id.* at 13 (citation omitted).

A stronger "mix" of the two tests appears in *United States v. West*, 3d Cir., 511 F.2d 1083 (1975). In *West* the Third Circuit observed that

"[f]requently, it is permissible law enforcement practice for an undercover agent to obtain evidence of unlawful traffic in narcotics by purchasing heroin from a suspected drug peddler. But when the government's own agent has set the accused up in illicit activity by supplying him with narcotics and then introducing him to another government agent as a prospective buyer, the role of government has passed the point of toleration. Moreover, such conduct does not facilitate discovery or suppression of ongoing illicit traffic in drugs. It serves no justifying social objective. Rather, it puts the law enforcement authorities in the position of creating new crime for the sake of bringing charges against a person they had persuaded to participate in wrongdoing. It was this evil of law enforcement officers instigating a criminal act by persons "otherwise innocent in order to lure them to its commission and to punish them" that led the Supreme Court to its first reversal of a conviction on the ground of entrapment [in] *Sorrells*, [supra,]....

....

While we view *West's* case as one of intolerable conduct by government agents, one supplying and the other buying the narcotics, the same result is reached if the entrapment aspect of this case is analyzed as depending solely on the predisposition of West to engage in illicit drug traffic. (subjective test) The government argues that the series of sales made by West during the latter part of January, the first predating the transactions for which he was indicted, shows predisposition. But if, as the evidence indicates, these four transactions among the same three people within a ten day period were all part of a scheme proposed

by a government agent, the relevant predisposition is West's attitude on January 19, just before the government agent enlisted his participation in the venture." *Id.* at 1086.

## IV

In light of these general principles, we now turn to defendant's contentions. The defendant bases her position that she was entrapped as a matter of law upon a series of "objective test" cases standing for the proposition that entrapment exists as a matter of law where government agents furnish contraband to a defendant, who, in turn, sells it to another government agent or other third person. See *West*, supra; *United States v. Bueno*, 5th Cir., 447 F.2d 903 (1971); *Syler v. State*, Miss.Supr., 340 So.2d 10 (1976); *Talbot*, supra; *Rogers v. State*, Fla.Ct.App., 277 So.2d 838 (1973); *State v. McKinney*, Ariz.Supr., 108 Ariz. 436, 501 P.2d 378 (1972); *People v. Dollen*, Ill.Supr., 33 Ill.2d 280, 290 N.E.2d 879 (1972).

We find, however, that especially by virtue of § 432 this Court does not have the discretion, exercised in the "objective test" cases, to apply "a 'chancellor's foot' veto over law enforcement practices of which" we may not approve. *Russell*, supra, 411 U.S. at 435, 93 S.Ct. at 1644. In *Russell*, the United States Supreme Court also observed that its earlier decisions established that "entrapment is a relatively limited defense. It is rooted, not in any authority of the Judicial Branch to dismiss prosecutions for what it feels to have been 'overzealous law enforcement', but instead in the notion that Congress could not have intended criminal punishment for a defendant who has committed all the elements of a proscribed offense but was induced to commit them by the Government." *Id.* at 435, 93 S.Ct. at 1644.

■ By the explicit language of § 432, the legislative intent is made clear and unambiguous: entrapment is a defense where

there exists "wrongdoing of the officer [who] originates the idea of the crime and then induces the other person to engage in conduct constituting such a crime when the other person is not otherwise disposed to do so." Thus, the test for entrapment under the statute requires us to focus on the predisposition of the defendant and on the conduct of the government agents. Defendant has cited no cases, and we are aware of none from our jurisdiction, construing § 432 which support her claim that the instant fact situation constitutes entrapment as a matter of law. We noted earlier that such a view represents a position espoused by a dissident minority of the United States Supreme Court. See *Hampton*, supra, 435 U.S. at 500, 96 S.Ct. at 1655 (Brennan, J., dissenting). Moreover, we believe that the entrapment defense of § 432 is a factual question which is strictly within the province of the jury, *Sorrells*, supra; *State v. Brown*, Del.Supr., 287 A.2d 400, 404 (1972), which must be proved by defendant under a preponderance of the evidence standard. In light of the language of § 432 and the general principles set forth above, we hold that the circumstances at Bar do not amount to entrapment as a matter of law. Accordingly, the Trial Court was correct in denying the defendant's motion to set aside the verdict on that ground.

## V

There remain defendant's second and third arguments to consider. We deal first with the latter.

■ Defendant maintains that there was no evidence to show that she was predisposed to commit the offenses charged. Defendant relies on *West*, supra, in support of her claim that "the relevant predisposition" is the attitude of an accused "just before the government agent enlisted [her] participation in the venture." *Id.* at 1086. The evidence at trial showed that defendant brought food into the prison and gave it to inmates on numerous occasions. Under

prison rules, food brought into the compound from outside is technically contraband. Applying the Third Circuit rule for establishing predisposition, defendant can fairly be said to have been predisposed to violate prison rule and a statute (11 *Del.C.* § 1256) forbidding the introduction of contraband into a prison. We recognize, however, that defendant's conduct in giving inmates left-over portions of her lunch is a slim reed upon which to find predisposition and rest her convictions for the offenses charged, and an insufficient one as a matter of law.[7]

The Third Circuit test for predisposition is a useful tool for determining an accused's proclivity toward commission of a criminal act. Certainly a defendant's conduct "just before a government agent enlisted his participation in the venture" is relevant to a determination of a defendant's predisposition. However, we are disturbed by a test which confines the scope of focus wholly on the issue of predisposition to the time period "just before" the police solicited defendant to participate in the criminal scheme. The application of the rule in *West* would provide an entrapment defense to every individual who establishes an unblemished personal record prior to being approached to commit a crime. Furthermore, it is often the case that "the sole proof of predisposition consists of evidence as to what the defendant did on the occasion in question, in response to the overtures of the government agents." *United States v. Jannotti*, 501 F.Supp. at 1191. Hence, we believe that the interval between the solicitation and the actual commission of the offense is highly significant on the question of predisposition because it is within that time period that an accused may exhibit manifestations of his propensity for a specific crime which might not appear were it not for the State's initial enlistment of the defendant's participation.

■ Thus, we hold that the point of reference for ascertaining the predisposition of a defendant to commit a particular crime is the time period extending from just before the State's solicitation to just before the defendant's commission of the crime.[8]

■ Under this test, we find that defendant was predisposed to commit the crimes charged. Defendant was approached by Barlow to secure and deliver drugs to him. By her own admission, without pressure or threat, defendant agreed to participate in the scheme. As planned, defendant called Officer Williams ("Dennis") and scheduled a meeting. Although nervous, she agreed to smuggle drugs into the prison even though she was twice given the opportunity to withdraw from the arrangement by Officer Williams. At the second and third meetings, defendant was more relaxed about the transactions. No pressure or force was exerted upon her to continue with the plan, yet she smuggled the drugs into the prison and accepted the bribes on two occasions separated by almost a month. Defendant conceded that she knew it was wrong to smuggle the marijuana into the institution yet she persisted in continuing the plan. Such evidence was sufficient to indicate that the defendant was predisposed to violate the law before she actually committed the offenses.

## VI

■ Our inquiry does not end here. Pursuant to § 432 and the apparent majority position of the United States Supreme Court, see *United States v. Jannotti*, slip op. at 607–608, we must address the character of the State's inducement. If it was, as the defendant alleges, so outrageous and overreaching as to violate the right to due process, or if the police conduct

---

7. Defendant was charged with violation of 11 *Del.C.* § 1256, Promotion of Prison Contraband, for bringing marijuana, not food, into the prison.

8. Even a defendant's post-crime actions may be relevant to a determination of predisposition. See *United States v. Jenkins*, 5th Cir., 480 F.2d 1198, 1200, *cert. denied*, 414 U.S. 913, 94 S.Ct. 256, 38 L.Ed.2d 151 (1973).

was "intolerable" and went "beyond that necessary to sustain an entrapment defense", *id.* at 608, then her conviction cannot stand, *United States v. Twigg,* 3d Cir., 588 F.2d 373 (1978), notwithstanding our finding that she was predisposed to violate the law. *United States v. Lentz,* 624 F.2d 1280 (5th Cir. 1980).

As the District Court in *Jannotti* noted, the term "inducement" encompasses such diverse governmental conduct as

"suggesting that the crime be committed, providing some or all of the instrumentalities or facilities needed to complete the crime, actively participating in the commission of the crime, providing varying degrees of incentives, providing varying degrees of persuasion or even coercion, or a combination of these ingredients."

*United States v. Jannotti,* 501 F.Supp. at 1190.

And in *Jannotti,* the Court of Appeals made this important analysis:

"It is plain from the Court's opinion in *Russell* and the separate opinions in *Hampton,* however, that a successful due process defense must be predicated on intolerable government conduct which goes beyond that necessary to sustain an entrapment defense. The genesis of the entrapment defense lay in the Court's interpretation of legislative intent; '[s]ince the defense is not of a constitutional dimension, Congress may address itself to the question and adopt any substantive definition of the defense that it may find desirable.' *United States v. Russell,* 411 U.S. at 433 [93 S.Ct. at 1643] (footnote omitted). We must necessarily exercise scrupulous restraint before we denounce law enforcement conduct as constitutionally unacceptable; the ramifications are wider and more permanent than when only a statutory defense is implicated.

We must be careful not to undermine the Court's consistent rejection of the objective test of entrapment by permit-

ting it to reemerge cloaked as a due process defense. While the lines between the objective test of entrapment favored by a minority of the Justices and the due process defense accepted by a majority of the Justices are indeed hazy, the majority of the Court has manifestly reserved for the constitutional defense only the most intolerable government conduct."

*United States v. Jannotti,* at 607–608.

■ While the exact boundaries for permissible and impermissible government conduct within the bounds of due process in the context of entrapment have not yet been set by the United States Supreme Court, we do not believe that the conduct of the police in the instant case rises to the level of a due process violation. The defendant was given the opportunity to withdraw on several occasions. The record is devoid of evidence of overbearing, pressure, threat or force exerted upon defendant to secure her cooperation. The police merely presented her with an opportunity for crime which she seized.

■ Courts must look to the nature of the crime and the means available to law enforcement officials to combat it in deciding whether police conduct violates due process. Illicit trafficking in narcotics presents special problems of proof, detection and danger for law enforcement personnel. See *Jannotti,* slip op. at 65. Many times the only way for police to combat such crime is to set up an operation similar to the one *sub judice.* This is especially so when the setting for the drug trafficking is a State prison. To hold that the conduct of the State Police in this matter was over-reaching and injurious to defendant's due process right would be to deprive our law enforcement officers of an effective tool for stamping out crime, and we decline to do so.

Invocation of an "entrapment" defense conjures up notions of tricky policemen trying to prey upon the needs and weaknesses of people and to persuade innocent citizens to commit crimes, when the police ought to

be spending their time catching real criminals. We certainly agree that the police should not buy crimes and, if that were all there were to this case, it should be reversed.

Here, however, contraband, including drugs, was getting into the prison and the job of the police was to stop it. When the police gave defendant an opportunity to smuggle in drugs, she took it, did it twice (for a price) and got caught.

Since it is undisputed that the police originated the idea, inducement was the critical issue at trial. That is a factual question (was defendant persuaded by the police to do what she did?) and the jury, after hearing all of the facts, concluded that defendant was not induced to do what she was not otherwise disposed to do.

Certainly there was plenty of evidence from which the jury could conclude that defendant was not "induced": She was not under police observation during the times she took the contraband into the prison, she figured out how to do that and, significantly, she also worked out the scheme for delivering the drugs to Barlow within the prison. She (admittedly) had ample opportunity to back out, not only from the beginning but also while she acted alone, taking the drugs into the prison and making delivery. And she did all of that, not once, but twice, some three weeks apart. To the extent that "pre-disposition" is significant, completion of the first delivery at least shows that defendant was disposed to do it again.

The case presents a hard question in the administration of justice. There surely are limits to which the police may go and at which even good faith efforts to enforce the law (and protect society) transmutes into an entrapment which, as a matter of law, violates due process. But here, it should be noted, the offenses which were basic to defendant's criminal conduct ("promoting prison contraband ... [by] ... knowingly and unlawfully ... [introducing] contraband into a detention facility," 11 *Del.C.* § 1256, and the delivery of a "controlled substance," 16 *Del.C.* § 4752, (marijuana) involved her conduct while she was completely free from contemporaneous police persuasion. Factually, as the jury found, there was no "inducement" at that time. In the instant case, then, the State Police did not transgress the boundaries of permissible police practice in violation of due process.

Accordingly, the Superior Court's denial of the defendant's motion to set aside the jury's verdict of guilty is hereby

AFFIRMED.

QUILLEN, Justice, dissenting:

I confess shock at the absence of a clear federal constitutional restriction on the material inducement that a law enforcement officer or his agent can offer to another to get the other to commit a crime.[1] While some of the same considerations are present, the question of a constitutional restriction is necessarily entirely separate from any legislative or common law intent as to the defense of entrapment.[2] The independence arises necessarily from the language of the Fourteenth Amendment, "nor

1. I emphasize that my shock is directed to the law and not to this particular police activity. It is the courts that have failed to provide clear constitutional guidelines with regard to due process claims.

2. I recognize with deference that a three Justice plurality of the United States Supreme Court in *Hampton v. United States,* 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976) denied the existence of a due process right of a defendant beyond the federally recognized defense of entrapment. Under that federal defense, the defendant's "conceded predisposi-

tion" was said to render the entrapment defense, and derivatively the due process defense, unavailable. But in summarily denying that police conduct might deprive the defendant of a "right secured to him by the United States Constitution", the plurality opinion is singularly unconvincing. Significant contrary considerations have weighed heavily, at least in the entrapment context, on the minds of Brandeis, Holmes, Frankfurter, Harlan, Douglas, Black and Stewart. *See Justice Brennan's dissent in*

shall any State deprive any person of life, liberty, or property, without due process of law". The United States Supreme Court has said:

"... Judicial review of that guaranty of the Fourteenth Amendment inescapably imposes upon this Court an exercise of judgment upon the whole course of the proceedings in order to ascertain whether they offend those canons of decency and fairness which express the notions of justice of English-speaking peoples even toward those charged with the most heinous offenses."

*Malinski v. New York*, 324 U.S. 401, 416–417, 65 S.Ct. 781, 789, 89 L.Ed. 1029 (1945). That is a different question than the question of legislative intent in the defense of entrapment.

I recognize that abuse is rampant in defense claims of entrapment. I also recognize that the recent, well publicized, despicable conduct of certain public officials in the ABSCAM cases has made entrapment related defenses particularly unpopular nationally. Nor can I disagree with the majority here as to our particular statutory defense of entrapment. The history of the statute and the placing of the burden of proof on the defendant in the affirmative defense classification demonstrate the factual nature of the inquiry into the origin, inducement and disposition issues.[3]

But I would have thought, given the frailty of mankind, that one difference between our society and totalitarian societies would be a constitutional recognition that government should not have the power to extend limitless temptation to make the average citizen a criminal, subject, at the State's discretion, to the loss of liberty and property.[4] We have enough crime without giving the State unlimited power to buy more. In other societies, particularly the Soviet Union, government sponsored corruption and related selective law enforcement are used as a means to perpetuate State subjugation of the citizenry. Under such a system everyone becomes subject to prosecution at the whim of the State.[5] Failure to clearly recognize a similar potential evil in State sponsored crime in the entrapment context, in my opinion, is a glaring void in our constitutional case law. There is something fundamental at stake.

The majority opinion has reviewed the prevailing federal authorities. In my judgment, the United States Supreme Court decisions are inconclusive as to the constitutional limit on government inducement of criminal activity.[6] Although perfectly legitimate, I consider it foreign to a sense of order in American law for each State jurisdiction to interpret general constitutional concepts as frolics of its own. Thus, I

*Hampton* and Justice Douglas's and Justice Stewart's dissents in *United States v. Russell*, 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973). The views expressed in this dissent may be in error but I am satisfied that they are not idiosyncratic.

3. Compare the Proposed Criminal Code with Commentary (1973) § 432 with the current 11 *Del.C.* § 432. In particular, I find nothing to indicate that the "not otherwise disposed to do so" issue was intended to be judged solely by the defendant's conduct prior to the governmental contact.

4. It is not a complete answer, in my opinion, to say that people should not commit crimes. Besides normal human sinfulness in face of monetary reward, there can be weakness due to numerous pressing variables such as illness in the family, overwhelming educational expenses or, in the case of a prison guard, limited salary and limited opportunity for advancement in a difficult work environment. These factors do

not justify crime but, absent justification, it should not be the State that preys on the citizen's weakness.

5. See Katsenelinboigen, "Coloured Markets in the Soviet Union", *Soviet Studies*, vol. XXIX, no. 1, January 1977, 62–85. See also Judge Aldisert's dissent in *United States v. Jannotti*, 673 F.2d 578 (1982) (en banc).

6. It is particularly noted that the plurality opinion in *Hampton v. United States*, 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976), is limited to three Justices. Five Justices, two in concurrence and three in dissent, recognized a role for due process in the entrapment context even if the defendant was otherwise disposed to commit the crime. I recognize that the factual situation in *Hampton* is similar to this case and therefore the concurring opinion can be viewed as contrary to this dissent. But the whole context of *Hampton* focused on the contention "that the Government's supplying of contra-

would, at this point, avoid the expediency of turning to our State Constitution.[7] Rather, given the depth of the shock to a just sense of ordered liberty and the lack of definitive due process statements from the United States Supreme Court in the entrapment context, I with considerable embarrassed reluctance, presumptuously take the opportunity to minimally suggest that federal due process may be touched when the State, in a transaction of illegal drug delivery, induces a citizen through State bribery to be a State sponsored criminal conduit between a State sponsored supplier and a State sponsored recipient. The crime of illegal delivery is clearly being committed by the State. In my judgment, before the State can criminally convict the conduit, its own agent, it should, as a matter of constitutional law before the trial judge,[8] be prepared to demonstrate it had reasonable grounds to suspect the defendant was engaging in criminal activity related to the State originated crime[9] or the State should be prepared to demonstrate that there had existed so significant a threat to the public order that there was no reasonable alternative to its investigative tactic.[10] Lacking such a nonjury showing before the trial judge, the conduct, in my opinion, is outrageous and violates due process.[11] Fundamental fairness should not permit a conviction.

In the instant case, I would reserve jurisdiction and remand the case to the Trial

band to one later prosecuted for trafficking in contraband constitutes a *per se* denial of due process." Justice Powell's concurrence in particular must be judged in that limited context. I suggest in this dissent that we should explore the constitutional issue beyond that context.

7. It is, of course, open for State courts to interpret State constitutions to provide greater rights than the corresponding provisions in the federal Constitution. *Goddard v. State*, Del. Supr., 382 A.2d 238, 240, n. 4 (1977). See also *Hunter v. State*, Del.Supr., 420 A.2d 119, 134, n. 4 (1980) (Quillen, Justice, dissenting).

8. As I see it, the due process issue is an issue of constitutional law for the trial judge. Thus, matters which might be considered prejudicial, if placed before the jury, can be freely heard and evaluated. In the instant case, for example, the source of the rumors relating to the defendant's involvement in illegal drug traffic could be weighed in judging the State's actions.

9. This would be a lesser standard than probable cause to arrest. It is a standard that has proved workable under our arrest law. *State v. Deputy*, Del.Supr., 433 A.2d 1040, 1042–1043 (1981). See also *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

10. It is impossible, of course, to foresee every situation and, as related to the instant case, drug use in a prison could constitute a significant threat. The nature of the defendant's official position should also be considered. Thus, a strict standard of reasonableness would still supply needed flexibility.

11. Compare the concurring opinion of Justice Powell and the dissenting opinion of Justice Brennan in *Hampton, supra*. The modest due process threshold suggested here would have been met on the basis of the informant's testimony in *Hampton* and in an overwhelming number of entrapment cases. Compare also *United States v. Twigg*, 3d Cir., 588 F.2d 373, 378–379 (1978) and *Greene v. United States*, 9th Cir., 454 F.2d 783, 787 (1971). The focus of due process inquiry has been on (1) whether government supplied contraband *per se* mandates dismissal or acquittal or (2) whether the degree and character of governmental activity is outrageous. Nothing herein is intended to take issue with the rejection of the first by a majority of the United States Supreme Court or the approval of the second by a different majority of the same Court. Admittedly, I am suggesting a different focus dictated by the present factual record in this case but it is one which draws by analogy on existing precedent in an attempt to provide some measure of citizen protection without interference with legitimate law enforcement. To suggest, as does the Third Circuit majority in *Jannotti, supra*, that such an inquiry is an invasion of the province of the law enforcing executive branch is, in my opinion, to misconstrue the fundamental role of the judicial branch. The protection of the individual citizen against a prosecuting State is not "more appropriately considered through the political process where divergent views can be expressed in the ballot box." Compare *Jannotti*, 3d Cir., Nos. 81–1020 & 81–1021, slip op. at 66 at —— (Feb. 11, 1982) (en banc).

Judge to conduct a due process hearing and to make the necessary findings of fact and rulings of law. Thus, I would require a due process focus by the Trial Judge before rendering appellate judgment. By this separate opinion, I do not intend to suggest what the result of that focus would or should be in this case.