Robert E. VAN ARSDALL, Defendant
Below, Appellant,

v.

STATE of Delaware, Plaintiff
Below, Appellee,

and

Gannett Company, Inc.,
Intervening Appellee.

Supreme Court of Delaware.

Submitted Sept. 10, 1984.

Decided Nov. 19, 1984.

2

**4**

William N. Nicholas (argued), Dover, and John R. Williams (argued) of Prickett, Jones, Elliott, Kristol & Schnee, Dover, for appellant.

Gary A. Myers (argued), Deputy Atty. Gen., Georgetown, for appellee.

Louis J. Finger, of Richards, Layton & Finger, Wilmington, for intervening appellee.

Before McNEILLY, MOORE, and CHRISTIE, JJ.

CHRISTIE, Justice:

This case involves an appeal from a conviction in the Superior Court, Kent County, of murder first degree and possession of a deadly weapon during the commission of a felony.

The defendant, Robert Van Arsdall, was accused of murdering Doris Epps in a friend's apartment, shortly after the conclusion of an all day New Year's Eve party on December 31, 1981. The party, which lasted from approximately 11:00 a.m. to 12:00 midnight, took place in and between two adjacent apartments, one of which was occupied by Daniel Pregent and the other by Robert Fleetwood. It is apparent from the testimony given at trial that various persons had attended the party on and off over the course of the day, and that the defendant was one of those transient guests. The defendant testified that he had stopped in at the party for two brief periods in the late afternoon and early evening; he then returned to the party for a third time at about 11:30 p.m.

The evidence indicated that as the evening wore on, the party lost much of its jovial spirit. Pregent had an altercation with a female guest at one point and had to be restrained. The victim of the homicide, Doris Epps, had passed out by 10:30 p.m., perhaps as a result of excessive use of alcohol. She had been placed in a convertible sofa bed in the living room/bedroom area of Pregent's apartment. A short time later, a second altercation of some kind occurred, this time in Fleetwood's apartment, and this prompted Fleetwood to "close" the party in his apartment to everyone except his two friends, Alice Meinier and Mark Mood.

When the defendant returned to the party for the third time, he entered Pregent's apartment through a back entrance shortly after 11:30 p.m. At that time, only Pregent and the unconscious Doris Epps were present. Fleetwood testified that shortly before going to sleep in his own apartment, he had walked across the hall and looked into Pregent's apartment where he had seen the defendant sitting on the sofa bed next to Pregent's feet. Meinier testified that she, too, walked across the hallway in order to find out what time it was by looking at Pregent's clock, which was located in his kitchen. She stated that when she did this it was 11:53 p.m., and that she saw nothing unusual in the dark living room area of the apartment. Meinier went on to testify that about one hour later, the defendant came to Fleetwood's apartment with blood on his hands and shirt, holding a long, bloody knife.

The police were called and when they arrived a few minutes later, they found Epps' body lying in a pool of blood on the kitchen floor of Pregent's apartment. Pregent was asleep on the blood-splattered sofa bed in his darkened living room.

Both defendant and Pregent were subsequently arrested and charged with murder first degree. Defendant was tried first. The State relied on the circumstantial evidence outlined above. The defendant took the stand and denied that he took any part in the killing. He testified that he saw

Pregent stabbing the victim. He was nevertheless found guilty by the jury. The State did not seek the imposition of capital punishment. Pregent did not testify at Van Arsdall's trial. Pregent was tried later and was found not guilty.

On appeal, the defendant makes many arguments. We find reversible error in one of the trial court's important rulings and, therefore, reverse the defendant's conviction and remand the case for a new trial.

## I

The defendant argues that it was error for the trial court to limit his cross-examination of three prosecution witnesses. In the first instance, the defendant contends that the trial court erred by ruling that he could not question Robert Fleetwood about Fleetwood's prior arrest and about a previous occasion on which Fleetwood had been questioned by a detective. The defendant contends that this ruling denied him the opportunity to expose Fleetwood's possible bias in testifying for the State and also deprived defendant of his right to confront the witnesses against him. U.S.Const. amend. VI; Del. Const. art. I, § 7.[1] The defendant argues that the language this Court employed in *Weber v. State*, Del. Supr., 457 A.2d 674 (1983), makes it clear that we must reverse his conviction. We agree.

■ It is well established that the bias of a witness is subject to exploration at trial and is "always relevant as discrediting the witness and affecting the weight of his testimony." *Davis v. Alaska*, 415 U.S. 308, 316, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347 (1974) [quoting 3A J. Wigmore, *Evidence* § 940, at 775 (Chadbourn rev.ed. 1970)]; *Weber*, 457 A.2d at 680. Moreover, "cross-examination on bias is an essential element of the constitutional right of confronta-

tion." *Wintjen v. State*, Del.Supr., 398 A.2d 780, 782 (1979). In *Weber*, we acknowledged the accused's right to a "certain threshold level of cross-examination," and observed that the presumption in favor of cross-examination requires the trial judge to permit inquiry into "any acts, relationships, or motives reasonably likely to create bias." *Weber*, 457 A.2d at 680, 682.

■ The trial court may not foreclose a legitimate inquiry into a witness' credibility before the defendant's Sixth Amendment confrontation right has been adequately met. *See Weber*, 457 A.2d at 681–682; *United States v. Mayer*, 556 F.2d 245, 250 (5th Cir.1977). In *Weber* this Court set forth a two-part test for determining whether limitations imposed by the trial judge on a relevant line of cross-examination violate the accused's right of confrontation. Specifically, we said that we would look to the cross-examination permitted to ascertain (1) if the jury were exposed to facts sufficient for it to draw inferences as to the reliability of the witness and (2) if defense counsel had an adequate record from which to argue why the witness might have been biased. *Weber*, 457 A.2d at 682. *See, United States v. Summers*, 598 F.2d 450, 461 (5th Cir.1979). Clearly, the trial court's decision to prohibit *all* questioning concerning the dismissal of charges against Fleetwood for being drunk on the highway prevented the jury from considering facts from which it could have drawn inferences about Fleetwood's testimonial reliability. Under the circumstances, the defense had a right to introduce such testimony.

■ The State correctly points out that "some topics will be of marginal relevance, and that the trial court in such situations may properly prohibit cross-examination or allow only limited questioning." *Weber*,

---

1. The U.S. and Delaware Constitutions provide in pertinent part:

"In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him...." U.S.Const. amend. VI.

and

"In all criminal prosecutions, the accused hath a right ... to meet the witnesses in their examination face to face...." Del.Const. art. I, § 7.

457 A.2d at 682. We note, moreover, that under some circumstances a judge may exclude evidence in instances such as these even though bias or prejudice might have been disclosed. *Weber,* 457 A.2d at 682. *See Davis v. Alaska,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974). The State contends that the defendant's proposed lines of inquiry were only marginally relevant, and that the trial court properly ruled against such cross-examination. However, under the circumstances present in this case, we cannot agree. The question of bias was an important issue before the court and the excluded evidence was central to that issue.[2] We conclude that the trial judge abused his discretion when he ruled that defendant could make no inquiry into Fleetwood's possible understanding that charges pending against him were dismissed in exchange for his cooperation with the State.[3]

The State next argues, however, that even if the defendant was deprived of his confrontation right, such error was harmless because Fleetwood's basic testimony was cumulative in nature and unimportant. We noted in *Weber* that "the standards used to determine if there is a violation of the confrontation clause in the first instance are similar, if not identical, to those used in deciding if the error was harmless." *Weber,* 457 A.2d at 683. In *Reed v. United States,* D.C.App., 452 A.2d 1173, 1176–77 (1982), the court stated a test consistent with *Davis v. Alaska,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974), and with our ruling in *Weber* for determining whether a violation of the confrontation clause is harmless:

> Where the record reflects a curtailment of a requested line of bias cross-examination *in limine,* so that the jury is unable to perform its fact-finding function in inferring bias from the testimony as a whole, we will assess cross-examination errors by a per se error standard. If, however, the trial court has permitted *some* cross-examination so that the jury has sufficient information from which to infer bias (should it so choose), this Court will evaluate error by application of the harmless constitutional error test of *Chapman v. California, supra* [386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)]. To hold harmless such error in curtailing constitutionally protected cross-examination, it must be clear beyond a reasonable doubt ". . . that the defendant would not have been convicted without the witness' testimony . . . ." [Citing *Springer v. United States,* D.C.App., 388 A.2d 846, 856 (1978)].

We hold that under the circumstances of this case, where the defendant was subjected to a blanket prohibition against exploring potential bias through cross-examination, the trial court committed a per se error. Consequently, the actual prejudicial impact of such an error is not examined and reversal is mandated. *See Webb v. United States,* D.C.App. 388 A.2d 857, 858 (1978).

■ The defendant also argues that it was error for the trial court to limit his cross-examination of Alice Meinier. He contends that his right to cross-examina-

---

**2.** On voir dire, Fleetwood revealed the following:

Q [Mr. Reed]: "What was your understanding of why the charge was dropped?"
A [Fleetwood]: "Well, I did understand that I did feel that you wanted me to make sure that I knew what I was talking about, and I do feel that you wanted to make sure I had my story together before coming in here. So that is why I did feel that it was dropped."

\* \* \* \* \* \*

**3.** Although we need not and do not consider whether the trial court erred in preventing the

defendant from cross-examining Fleetwood about a previous occasion on which Fleetwood had been questioned by a detective in a separate murder investigation, we note that the presumption in favor of cross-examination requires that an accused be given some latitude to search for agreements or understandings, even where no actual or communicated deal exists. ·*See, Greene v. Wainwright,* 634 F.2d 272 (5th Cir. 1981); *United States v. Mayer,* 556 F.2d 245 (5th Cir.1977); *Burr v. Sullivan,* 618 F.2d 583 (9th Cir.1980).

tion encompasses an absolute right to question a witness about his or her address. We find his argument to be without merit. It is clear from the record that the defendant sought to elicit information not about Meinier's place of residence, but rather information about with whom she had been residing. *Cf. United States v. Harris,* 501 F.2d 1, 9 (9th Cir.1974) (requiring cross-examination about an address). The trial court did not err in ruling against such questioning since it apparently thought that counsel's main purpose was to subject the witness to harassment or humiliation. *United States v. Harris,* 501 F.2d at 9.

▮ Finally, we find no error in the trial court's decision to limit the defendant's cross-examination of Detective Bowers. The defendant claims that the State, in its direct examination, implied that a thorough police investigation at the murder scene led to defendant's arrest. Defendant now argues that the State, having raised the issue, opened itself to cross-examination on this point, and that the trial court abused its discretion in ruling that defendant could not question the detective on this matter. We do not agree. Assuming that the defendant's inquiry was directed at the issue of the thoroughness of the police investigation, the court could have reasonably concluded that such questioning was collateral because Alice Meinier's statement to the police and the blood found on the defendant's clothing justified the arrest.

## II

The defendant next raises several arguments which address the propriety of the trial court's evidentiary rulings. Although none of the alleged errors amounts to reversible error, we discuss some of the issues presented because there will be a new trial.

Initially, defendant contends that the trial court abused its discretion in admitting various exhibits into evidence. The defendant maintains that the admission of the victim's bloodstained clothing and, at least, one "gruesome" photograph of the victim

exposed the jury to evidence which was highly prejudicial and inflamatory. Defendant insists that any probative value of such evidence was outweighed by the prejudice involved. D.R.E. 403. In addition, the defendant claims that the admission of several articles of his clothing and numerous photographs of the victim were unnecessary and cumulative. We hold that these arguments are without merit.

▮ The trial court has wide discretion in admitting into evidence photographs of injuries to a victim. *Dickens v. State,* Del.Supr., 437 A.2d 159, 162 (1981). The court's discretion in admitting a victim's clothing is equally broad. *See Longoria v. State,* Del.Supr., 168 A.2d 695, 703, *cert. denied,* 368 U.S. 10, 82 S.Ct. 18, 7 L.Ed.2d 18 (1961). *Cf. Dutton v. State,* Del.Supr., 452 A.2d 127 (1982) (victim's remains not necessarily excludable.) The trial court ruled that the material and probative value of the evidence outweighed any prejudicial effect it might have. This Court cannot say that the trial court abused its discretion.

▮ Similarly, the defendant's claim that the introduction of his clothing was irrelevant is specious. *See, Dickens v. State,* 437 A.2d at 163.

▮ Finally, it must be remembered that D.R.E. 403 authorizes the trial judge to exclude only the needless presentation of cumulative evidence, and the court had wide discretion to determine whether the evidence in question was needlessly cumulative.

The defendant also asserts that it was error for the trial court to permit the prosecution to place into evidence various articles which the defendant wished to introduce as defense exhibits. We find no merit to defendant's argument.

▮ The trial court has broad authority in determining the mode and order of presenting evidence, and its choice can be overturned only if it infringes on a constitutional right or constitutes an abuse

of discretion. D.R.E. 611(a); *Geders v. United States*, 425 U.S. 80, 86, 96 S.Ct. 1330, 1334, 47 L.Ed.2d 592 (1976). It was not an abuse of discretion to refuse to allow the defendant to place exhibits into evidence during the prosecution's case-in-chief. *See State v. Washington*, La.Supr., 292 So.2d 234, 237–38 (1974).

■ The defendant next argues that the trial court abused its discretion in admitting into evidence transcripts of tape recordings. The defense maintains that since the recordings themselves were the "best evidence", the additional admission of the transcripts of the recordings violated the "best evidence" rule. D.R.E. 1001–1002. The defendant relies on dicta contained in the case of *Bonicelli v. State*, Okla.Ct.App., 339 P.2d 1063, 1065 (1959). However, most courts which have addressed this issue have rejected the position the defendant here takes, especially where, as here, the defense counsel "agreed" that the transcripts were fair and accurate reports of what was said. *See United States v. Turner*, 528 F.2d 143, 167–68 (9th Cir.), *cert. denied*, 423 U.S. 996, 96 S.Ct. 426, 45 L.Ed.2d 371 (1975); *United States v. Carson*, 464 F.2d 424, 436–37 (2d Cir.1972). We reject defendant's contention.

### III

Defendant contends that the trial court's failure to sequester the chief investigating officer, or alternatively, to require the officer to testify first, was an abuse of discretion, since the officer had a chance to hear the testimony of other witnesses—including defense witnesses—and he had an opportunity to tailor or fabricate his subsequent testimony accordingly.

■ However, it is clear in Delaware that sequestration is discretionary with the trial judge, *Holmes v. State*, Del. Supr., 422 A.2d 338, 340 (1980), and that it is often deemed proper to exempt the chief investigating officer from a sequestration order. *Grace v. State*, Del.Supr., 314 A.2d 169, 170 (1973). It follows that it is also

within a court's discretion to refuse to compel the officer to testify first and to allow the prosecution to present its evidence in chronological fashion. *See United States v. Butera*, 677 F.2d 1376, 1380–81 (11th Cir.1982), *cert. denied*, 459 U.S. 1108, 103 S.Ct. 735, 74 L.Ed.2d 958 (1983).

### IV

■ The defendant argues that the trial court erred in permitting Dr. Lee to give an expert opinion when his testimony appeared to be speculative in nature. The defendant's position is that Dr. Lee could not have given an informed opinion as to the movement of the victim's body because he lacked knowledge of a buttock wound, and that the doctor's use of words, such as "could", "possibly", and "maybe" indicate that he was engaged in speculation. We find defendant's argument to be without merit. We note that on cross-examination, the doctor testified that the conclusions he had reached concerning the movement of the victim's body would not have changed had he been aware of the buttock wound. We also conclude that the doctor's choice of words did not indicate that his conclusions were based on speculation. *See Air Mod Corp. v. Newton*, Del.Supr., 215 A.2d 434, 438 (1965).

### V

■ The defendant next argues that the trial court abused its discretion in refusing to consider an affidavit he presented in a pretrial suppression hearing. This argument is without merit. The court did not abuse its discretion in refusing to consider the affidavit in this case since the defendant refused to be cross-examined on the contents of that affidavit.

### VI

Defendant contends that the trial judge's instructions to the jury were erroneous in several respects.

Defendant argues that the trial court committed reversible error in giving the jury an accomplice instruction which was based on the possibility that the offense may have been committed by Daniel Pregent, and that the defendant may have been his accomplice. Defendant insists that there was insufficient evidence to warrant such a charge. We do not find the instruction to be erroneous. However, if there was error, it was clearly harmless error. *Barnes v. State*, Del.Supr., 352 A.2d 409, 410–411 (1976).

The defendant argues that the trial court erred in instructing the jury to disregard defense counsel's comment in closing that "circumstantial evidence is the weakest form of evidence." The law, however, assigns no lesser degree of probity to circumstantial evidence. *Holden v. State*, Del.Supr., 305 A.2d 320, 322 (1973). Hence, the trial court was correct when it instructed the jury to disregard defense counsel's erroneous statement.

The defendant says that the court's charge to the jury lacked sufficient factual detail. In the absence of any indication by the defendant suggesting the omission of specific and necessary factual details, the general instruction which traced the statutory language of the criminal statute is deemed to be adequate to inform the jury of the factual issues to be resolved. *Davis v. McAllister*, 631 F.2d 1256, 1260 (5th Cir.1980), *cert. denied*, 452 U.S. 907, 101 S.Ct. 3035, 69 L.Ed.2d 409 (1981). We find no error in what the trial court did in this respect.

### VII

The defendant argues that the trial judge erred in acting as one of the drivers who took the jurors to their overnight accommodations outside defendant's presence and outside the presence of legal counsel. The defendant claims that this *ex parte* contact infringed upon the constitutional commands of "presence", assistance of counsel, and jury impartiality. We conclude that the limited personal contact between judge and jury should have been avoided but it was harmless beyond a reasonable doubt, as that phrase is used in *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

The defendant goes on to assert that the trial court's "limited voir dire" of the jurors the next morning did not meet the requirements of the type of post-trial hearing which appears to have been mandated by the United States Supreme Court in *Rushen v. Spain*, 464 U.S. 114, 104 S.Ct. 453, 78 L.Ed.2d 267 (1983). (The *Rushen* case involved an *ex parte* communication between the trial judge and a juror as to an incorrect answer the juror had given to a voir dire question.) It is clear, however, that a post-trial hearing is not required in all instances. Although the Supreme Court found that a post-trial hearing was appropriate in that case, the court went on to state that "[t]he adequacy of any remedy is determined solely by its ability to mitigate constitutional error, if any, that has occurred." *Rushen*, 104 S.Ct. at 456.

In the case at bar the trial judge simply drove some of the jurors to their lodgings. The next day, at the defendant's request, the jurors were questioned about their contact with the judge. The jurors reported that they had had no communication with the judge concerning the case. Under the circumstances, the voir dire was adequate.

The court below committed no reversible error in driving the jury to its lodgings or in its later voir dire. However, such contact with jurors should be avoided in the future.

### VIII

The defendant next makes a series of arguments objecting to the jury selection process. The defendant's basic position is that the use of voter registration lists as the sole source for the selection of potential jurors was inadequate to assure a representation from a fair cross section of the community. 10 *Del.C.* § 4501; U.S.

Const. amend. VI; Del. Const. art. I, § 7.[4] Ultimately, the defendant attacks three statutory provisions in support of his contention.

▮ (a) The defendant initially asserts that the exclusive use of voter registration lists is improper in Kent County because of the large number of individuals employed at Dover Air Force Base who may be registered to vote in other states, and thus, would not be called to serve on a Kent County jury. In effect, the defendant also challenges 10 *Del.C.* § 4504(b)(6)(i),[5] which exempts military personnel from jury service. The defendant argues that exempting the population at the military facility prevents the venire from having a fair cross section of the community. We find the defendant's argument unpersuasive.

In *Duren v. Missouri,* 439 U.S. 357, 364, 99 S.Ct. 664, 668, 58 L.Ed.2d 579 (1979) the United States Supreme Court held that:

"[I]n order to establish a *prima facie* violation of the fair cross section requirement, the defendant must show (1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in the venires from which juries are selected is' not fair and reasonable in relation to the number of such persons in the community; and (3) that the under-representation is due to a systematic exclusion of the group in the jury selection process."

Moreover, to satisfy the "distinctive" requirement, a particular group must have a

unique outlook or "perspective on human events" not shared by other segments of the community, *see Taylor v. Louisiana,* 419 U.S. 522, 532, n. 12, 95 S.Ct. 692, 698, n. 12, 42 L.Ed.2d 690 (1975), and this distinctive requirement must exist as to a substantial number of people. *Duren,* 439 U.S. at 370, 99 S.Ct. at 671. Thus, the statutory exemption for military personnel would violate the fair cross-section requirement only if the defendant can show that those in the military service who have not registered to vote in Delaware have a unique perspective not shared by other members of the community. *See Walker v. State,* Alaska Supr., 652 P.2d 88, 92–93 (1982); *Taylor,* 419 U.S. at 534, 95 S.Ct. at 699. Defendant has not met this burden.

We also note that the Supreme Court has upheld "exemptions from jury service to individuals ... engaged in particular occupations the uninterrupted performance of which is critical to the community's welfare." *Taylor* 419 U.S. at 534, 95 S.Ct. at 699. It seems clear that occupations related to national defense are critical to the community's welfare. *See* 28 U.S.C. § 1863(b)(6)(i),[6] which is the federal counterpart to 10 *Del.C.* § 4504(b)(6)(i).

(b) The defendant next makes two separate, but closely related challenges. He argues that statutory disqualification from jury service of persons residing in the county for less than one year, 10 *Del.C.* § 4506(b)(1), and persons accused or convicted of serious crimes, 10 *Del.C.* § 4506(b)(5), deprives him of due process and equal protection of the laws. U.S.

---

**4.** 10 *Del.C.* § 4501 provides in pertinent part:
"It is the policy of the State that all litigants in state courts entitled to trial by jury shall have the right to ... juries selected at random from a fair cross section of the county wherein the court convenes."
We find that the policy of § 4501 is embodied in the due process requirement of the U.S. and Delaware Constitutions. Thus, the defendant's failure to comply with the procedural requirements of 10 *Del.C.* § 4508(a), (d) does not preempt his right to challenge any provision dealing with jury selection. *See United States v. Hawkins,* 566 F.2d 1006, 1014 (5th Cir.), *cert.*

*denied,* 439 U.S. 848, 99 S.Ct. 150, 58 L.Ed.2d 151 (1978).

**5.** 10 *Del.C.* § 4504(b)(6)(i) states that the jury selection plan:
"... shall provide for exemptions of ... (i) Members in active service in the armed forces of the United States...."

**6.** 28 U.S.C. § 1863(b)(6)(i) (Supp.1984) reads in pertinent part:
"The [jury selection] plan shall provide for the exemption of the following persons: (1) members in active service of the Armed Forces of the United States...."

Const. amends. V, VI, XIV. Del. Const. art. I, § 7.[7] We will address each of the defendant's claims:

■■■ *Due Process:* Most courts facing challenges of this type of juror residency requirement have held that newer residents are not a "distinctive" or "cognizable" class. *United States v. Maskeny*, 609 F.2d 183, 192 (5th Cir.) *cert. denied*, 447 U.S. 921, 100 S.Ct. 3010, 65 L.Ed.2d 1112 (1980); *United States v. Perry*, 480 F.2d 147, 148 (5th Cir.1973). Indeed, such "group's membership—cutting across economic, social, religious, and geographic lines—changes day to day, creating lack of real commonality of interest among the newly migrated." *Adams v. Superior Court of San Diego County*, Cal.Supr., 12 Cal.3d 55, 115 Cal. Rptr. 247, 524 P.2d 375, 378 (1974). The defendant, in urging us to adopt Justice Mosk's dissenting opinion in *Adams*, argues that newer residents are an identifiable and ascertainable group, and are, therefore, cognizable. *See* Adams 524 P.2d at 383 (Mosk, J., dissenting).

We cannot accept the defendant's position. Even if we assume that newer residents are an identifiable and ascertainable group, evidence of such group's "distinctiveness" is lacking. The United States Supreme Court, in recent decisions, has found that a distinct group in the community possesses a unique outlook or "perspective on human events." *See Taylor v. Louisiana*, 419 U.S. at 532, n. 12, 95 S.Ct. at 698, n. 12. The defendant has not shown that newer residents possess a common viewpoint not shared by other segments of the community. Furthermore, he has failed to establish that newer residents exist in such substantial numbers that, assuming a common perspective, the remaining pool of potential jurors would be unrep-

resentative of the community. *See Taylor*, 419 U.S. at 534, 95 S.Ct. at 699; *Duren v. Missouri*, 439 U.S. at 370, 99 S.Ct. at 671.

■■■ For similar reasons we find that the defendant has failed to demonstrate that exclusion of the class of persons then accused of, or previously convicted of serious crimes, limits the venire as a fair cross section of the community. Although it is true that members of this group share the common experience of being or having been in conflict with the authorities, the defendant has not shown that the perspective gained from such an experience is absent in other segments of the community, *see, Rubio v. Superior Court of San Joaquin Cty.*, Cal.Supr., 24 Cal.3d 93, 154 Cal. Rptr. 734, 593 P.2d 595, 598–99 (1979), or alternatively that exclusion of such group would "pose [a] substantial threat that the remaining pool of jurors would not be representative of the community." *Taylor*, 419 U.S. at 534, 95 S.Ct. at 699.

We hold that the one-year residency requirement of § 4506(b)(1) and the exclusion from jury service of persons who have serious criminal charges then pending against them or have been convicted of serious crimes under § 4506(b)(5), do not deprive the defendant of due process of law under the United States and Delaware Constitutions. U.S. Const.amends. VI, XIV; Del. Const. art I, § 7.

■■■ *Equal Protection:* The defendant also claims that the provisions of § 4506(b)(1) and (5) deprive him of equal protection of the laws. U.S. Const.amend. XIV. In the first instance, we find that the defendant has no standing to challenge the residency requirement under the equal protection clause. It is clear from the record that the defendant is actually asserting a

---

7. The relevant provisions provide in pertinent part:

"... [that] any person [is] qualified to serve on ... juries in Superior Court unless he:
(1) ... has [not] resided for a period of one year within the county ... or ...
(5) Has a charge pending against him for the commission of, or has been convicted in a

state or federal court of record of a crime punishable by imprisonment for more than 1 year...." 10 *Del.C.* § 4506(b)(1), (5).
and
"No State shall make or enforce any law which ... den[ies] to any person within its jurisdiction the equal protection of the laws." U.S. Const.amend. XIV, § 1.

claim *on behalf* of the newer resident class. Because he is not a member of the excluded class, the defendant has no standing to make an equal protection claim, unless he can show that he has been personally injured by the exclusion of newer residents from the jury list. *Peters v. Kiff*, 407 U.S. 493, 92 S.Ct. 2163, 33 L.Ed.2d 83 (1972). Since the defendant's "injury" is predicated on his claim that the venire was not composed of a fair cross section of the community, our resolution of that preliminary issue disposes of any equal protection claim.

■ The defendant's challenge to the exclusion of persons presently accused or previously convicted of serious crimes presents a different situation, since this defendant is a member of this arguably cognizable class. We conclude, however, that the exclusion of such persons from jury service does not deprive the defendant of equal protection of the law.

The defendant does not claim that the classification in question is "suspect" (as such classifications are primarily used in cases involving unconstitutional discrimination), and the defendant concedes that jury service is not a "fundamental right." It follows that the exclusion does not violate equal protection if it bears any rational relationship to some legitimate State objective. *Lowicki v. Unemployment Insurance Board*, Del.Supr., 460 A.2d 535, 538–39 (1983). *See Rubio v. Superior Court of San Joaquin Cty.*, 154 Cal.Rptr. 739, 593 P.2d at 600. The defendant argues that the State could have no legitimate interest in excluding persons accused of criminal acts who remain presumptively innocent, and that § 4506(b)(5) is unconstitutionally broad. We disagree. The State has an obvious and compelling interest in preserv-

ing the right to a fair trial by an impartial jury. The legislature could reasonably determine that persons presently accused or previously convicted of serious crimes, as present or past adversaries of "the system," may be biased in favor of a criminal defendant, whom is seen as a fellow victim of the system. *See Rubio*, 154 Cal.Rptr. 739, 593 P.2d at 600. The State could also reasonably conclude that jury service would interfere with an accused's preparation of his own defense, and conversely, that an accused's preoccupation with his own possible trial would interfere with his duties as a juror.

### IX

The defendant next claims that the trial court did not take adequate steps to assure the jury's impartiality. He contends that the trial court abused its discretion in rejecting five requested jury voir dire questions, which dealt with racial bias, and in failing to provide reasons for its denial of these and seventy-three other proposed questions.[8]

■ It is well established that the trial court's discretion on voir dire is restricted only by essential demands of fairness. *Hooks v. State*, Del.Supr., 416 A.2d 189, 195 (1980); *Shields v. State*, Del.Supr., 374 A.2d 816 (1977), *cert. denied* 434 U.S. 893, 98 S.Ct. 271, 54 L.Ed.2d 180 (1977).

■ A trial judge is required to inquire into the issue of racial bias when requested to do so, and he has a duty to present to the prospective jurors an appropriate question or questions, submitted by defense counsel, if such question or questions are designed to reveal such bias. *Hooks*, 416 A.2d at 195–96. *See Preston v. State*, Del.Supr., 306 A.2d 712, 716 (1973).

---

**8.** The proposed questions relating to racial bias read as follows:

69. Do you have any personal or professional relationships with blacks?

70. Do you think that black people have the same values and standards as other members of society?

71. Do you feel that there is any difference between black people and white people?

72. Do you think that black people have a more difficult time getting along in contemporary American society?

73. Have you ever had any dealings or experiences with black people that might make it more difficult for you to sit in impartial judgment on this case knowing that the alleged victim was black?

We conclude, however, that the questions here proposed dealing with racial bias were inappropriate, since they did not address the possibility of racial prejudice against the defendant, who is a white person, but instead addressed the possibility of prejudice against the black victim.

We find no error in the failure to give the other voir dire questions which were requested.

 The defendant also indicates that the voir dire was procedurally inadequate to determine the effect of pretrial publicity upon potential jury members. The defendant's claim is clearly without merit. The trial court's procedure of initially asking the venire in general whether they had heard or read anything about the case, and then questioning individually those who responded affirmatively, was proper and reasonably calculated to discover bias. *See United States v. Chagra*, 669 F.2d 241, 253–54 (5th Cir.) *cert. denied*, 459 U.S. 846, 103 S.Ct. 102, 74 L.Ed.2d 92 (1982); *United States v. Barton*, 647 F.2d 224, 230 (2d Cir.1981).

 For corresponding reasons we find that the measures taken to assure the jury's isolation from publicity during the trial were adequate. Under the guidelines set forth in *Smith v. State*, Del.Supr., 317 A.2d 20, 23 (1974), the judge admonished the jurors not to read media accounts at the end of each trial day, and inquired of the jurors, at the beginning of each subsequent day, whether they had heard or read anything about the case. No juror ever responded affirmatively. We reject the defendant's argument that the trial judge, should have admonished the media to adhere strictly to the Bar-Bench Press Declaration of Delaware.

## X

The defendant next argues that the trial court erred in denying defendant's motion for funds to employ a private investigator. The defendant maintains that a particular expert-investigator was needed to counteract the State's forensic evidence and to perform various other investigative functions. Since he had made a record of why an investigator was desired, the defendant argues he was constitutionally entitled to one and that the trial court's decision not to accede in his request deprived defendant of his right to effective assistance of counsel and equal protection of the law. U.S. Const.amends. VI, XIV. Del.Const. art. I, § 7.

 The decision to grant or deny funds for investigative services is within the sound discretion of the court. *See State v. Ayana*, Me.Supr., 456 A.2d 1255, 1262 (1983). An indigent defendant is not entitled to have investigative services provided by the State, unless he is able to show that such services are reasonably necessary for the preparation of an adequate defense. *United States v. Davis*, 582 F.2d 947, 951 (5th Cir.1978), *cert. denied*, 441 U.S. 962, 99 S.Ct. 2408, 60 L.Ed.2d 1067 (1979). The trial court's ruling will not be overturned on appeal unless there is a clear and convincing showing of substantial prejudice as a result of the denial of funds for investigative services. *Mason v. Arizona*, 504 F.2d 1345, 1353, 1355 (9th Cir.1974) *cert. denied*, 420 U.S. 936, 95 S.Ct. 1145, 43 L.Ed.2d 412 (1975).

 In this case defendant has failed to demonstrate such prejudice as would justify reversal of the trial court's decision. He has not identified any reasonably necessary services of an investigator which would have been material to the defense of this murder charge. Thus, there is no realistic suggestion that the particular investigator sought would have been able to "counteract" the State's evidence. And in any event, the defendant has not shown that it would have been impracticable for his counsel to conduct the proposed investigation. *See, Mason*, 504 F.2d at 1353. Under these circumstances, we cannot infer that the purported investigative services were necessary and conclude that the trial court's ruling did not deprive the defendant of effective assistance of counsel.

 

We also hold that defendant in this case has not shown that the State's failure to provide an investigator deprived him of equal protection of the laws. The defendant cannot reasonably claim that he has a general "fundamental right" to investigative services and, therefore, any disparity in the availability of investigative resources to indigents represented by the Public Defender as opposed to indigents represented by appointed counsel constituted nothing more than harmless error in this case. We note, however, as a general proposition, that where a reasonable need is clearly demonstrated, the State must provide the same ancillary services to those indigent persons represented by court appointed attorneys as it provides to those represented by the Public Defender.

### XI

We have been requested by defendant and by the intervening newspaper publisher to review the propriety of the standards applied by the trial court in denying the defendant's motion to close all pretrial proceedings to the public and press.[9] Under the present circumstances we decline to do so.

We conclude that the defendant has failed to establish that he was prejudiced by either the standards employed by the trial court in its evaluation of defendant's motion or by the subsequent pretrial publicity. There is no indication that defendant's right to a fair trial was jeopardized by the dissemination of any information disclosed in pretrial proceedings. Under the circumstances, it is unnecessary for the Court to specify which standard the trial court should have applied. *See United States v. Civella,* 648 F.2d 1167 (8th Cir.), *cert. denied,* 454 U.S. 867, 102 S.Ct. 330, 70 L.Ed.2d 168 (1981).

\* \* \*

The judgments and convictions are set aside, and the case is returned to Superior Court for a new trial.

---

9. Defendant urges this Court to adopt the constitutional balancing test used by the majority of the Supreme Court in *Gannett Co. v. DePasquale,* 443 U.S. 368, 99 S.Ct. 2898, 61 L.Ed.2d 608 (1979). The intervening newspaper publisher contends that the three-part formula used by the trial court is the proper standard of review.