George T. ATKINS, Appellant, Defendant Below,

v.

STATE of Delaware, Appellee, Plaintiff Below.

Supreme Court of Delaware.

Submitted: Feb. 24, 1987.
Decided: April 8, 1987.

James A. Robb, Wilmington, for appellant.

M. Jane Brady, Deputy Atty. Gen., Dover, for appellee.

Before MOORE, WALSH, and HOLLAND, Justices.

HOLLAND, Justice.

The defendant, George T. Atkins, was indicted for Delivery of Cocaine and Conspiracy Second Degree. A co-defendant, John Brokenbrough was indicted for Delivery of Cocaine. In addition, Mary Scott, a second co-defendant, was indicted for Delivery of Cocaine and other related offenses. Scott later pled guilty to reduced charges. After Atkin's motion to sever his trial from Brokenbrough's trial was denied, Scott, pursuant to her plea agreement, testified as a witness for the State at the joint trial of Atkins and Brokenbrough. During the trial, Brokenbrough presented an alibi defense while Atkins alleged entrapment as his defense. Following a jury trial in the

Superior Court in Kent County, both defendants were convicted as charged.

In this appeal, Atkins sets forth numerous grounds which he contends require reversal of his convictions. First, he alleges that the trial court erred in admitting into evidence transcripts of various tape recorded conversations in lieu of and despite the availability of the original tapes. Second, he alleges that the trial court erred in excluding tape recordings and/or testimony of conversations between a police officer and an informant allegedly showing the origins of the police plan to entrap Atkins. Third, Atkins alleges that the instructions to the jury were insufficient. Finally, he alleges that the trial court abused its discretion in denying his severance motion. We find that Atkins first two arguments are meritorious and, therefore, we reverse his convictions and order a new trial.

### FACTS

Atkins was alleged to have conspired with Mary Scott and arranged for the delivery of cocaine to an undercover officer, Detective William Bullen of the Delaware State Police. On March 1, 1985, Detective Bullen (posing as Ron Pearlstein's son) met with Atkins and Kenneth Green at the Gander Hill facility of the Department of Corrections. Both Atkins and Green were Gander Hill prison guards. Following this meeting, over the next several days, Bullen had several telephone conversations with Atkins and Green.

On March 5, 1985, Bullen met with Atkins for the purpose of purchasing cocaine. Bullen and Atkins drove to an apartment complex in Dover, Delaware. They both entered the apartment of Scott, who resided in the complex. Inside the Scott apartment, Detective Bullen asked Scott about the possibility of purchasing drugs. At the time, Detective Bullen was wearing a "body microphone" which tape recorded the conversation in the Scott apartment. Following a brief discussion, Scott left her apartment to procure some drugs. During Scott's absence, the co-defendant, George Atkins, told Detective Bullen that Scott was "only going three doors down." Scott returned to the apartment shortly after leaving and told Bullen that she could not obtain any cocaine at that time but that she could obtain some at about 3:30 p.m. later that day.

Detective Bullen and Atkins left the Scott residence. Atkins stated that he had to go to work but he assured both Scott and Bullen that they could trust each other. Detective Bullen returned to the Scott residence alone at approximately 3:30 p.m. where he met with Scott. Once again, Scott left her apartment after telling Detective Bullen to wait there. She returned promptly with a substance that was subsequently tested and proved to be cocaine. Detective Bullen paid Scott $1,040.00 for the drug and left the Scott apartment.

Scott was arrested later that same evening. Following her arrest, Scott gave a statement to the police indicating that she had obtained the cocaine which she had sold to Detective Bullen from Brokenbrough, the co-defendant.

At trial, Scott testified for the State. She related the substance of a conversation between Atkins and Green that took place in her apartment on the evening of March 4, 1985. She also testified about the events of March 5, 1985. Following her arrest on March 5, 1985, Scott had given a tape recorded statement to Delaware State Police detective Jackson. The State introduced the transcript of that tape recorded statement. Atkins introduced the actual tape of Scott's statement to Jackson.

Detective Bullen testified that Atkins showed no reluctance in speaking or meeting with him prior to March 5, 1985. Bullen stated that Scott was not known to him and that he would not have known to go to her apartment for drugs if Atkins had not taken him there. Bullen testified that the tape recorded conversation between Scott, Atkins and himself was reflected on a transcript. The taped conversation on March 5, 1985 between Scott, Bullen and Atkins was introduced into evidence by the State over the objection of Atkins. The State also introduced transcripts of two other recorded conversations between (1) Atkins and Bullen and (2) Atkins, Bullen and Green.

It is agreed that the actual tapes of all of the conversations, of which transcripts were introduced, were available at trial.

Atkins testified in his own defense. He stated that he did not know Brokenbrough prior to their joint trial and that they had had no prior dealings, directly or indirectly. In fact, Atkins testified that he had no contact at all with Brokenbrough concerning the Scott transaction on March 5, 1985. Atkins testified that he had never used or sold drugs previously. Atkins stated he was only trying to assist Bullen in contacting Green, as an accommodation to Green. Atkins stated that he had no desire to accomplish a sale or delivery of drugs or to have any financial gain.

As part of his defense, Atkins introduced several transcripts of taped conversations between Bullen and himself without objection by the State. Atkins also attempted to introduce evidence of conversations between Bullen and an inmate at Gander Hill who allegedly acted as a police informant. These conversations were offered in support of Atkins' defense of entrapment. The State's objections to evidence of these conversations through testimony from Bullen or by introduction of the actual tape recordings were sustained.

## INTRODUCTION OF TRANSCRIPTS IN LIEU OF TAPES

The State acknowledges that the actual tape recordings of all conversations between Atkins and Detective Bullen are in existence and were available at trial. Nevertheless, the State, over Atkins' objection, was permitted to introduce transcripts *only* as evidence of those conversations between (1) Atkins and Bullen, (2) Atkins, Bullen and Scott and (3) Atkins, Bullen, and Green. Delaware Uniform Rules of Evidence 1002 provides:

"To prove the content of a writing, recording, or photograph, the original writing, recording or photograph is required except as otherwise provided in these rules or by statute." D.R.E. 1002.

Atkins contends that the State was required to introduce the original tapes of the recorded conversations into evidence. The State argues that the original tapes were not required because it was not attempting to prove the content of the recordings but was attempting to prove the contents of the conversations.

The Delaware Uniform Rules of Evidence are modeled upon the Federal Rules of Evidence. However, D.R.E. 1002 tracks Uniform Rule of Evidence 1002 instead of F.R.E. 1002 which was believed to be inapplicable to a State. Nevertheless, the notes of the Federal Rules Advisory Committee are instructive and we must consult them for guidance. *See Ricketts v. State,* Del. Supr., 488 A.2d 856, 857, n. 2, (1985). That Committee observed that the application of Rule 1002 requires a resolution of the question of whether the *contents* of the writing or recording are sought to be proved.

The Federal Advisory Committee acknowledged that certain events may be proved by non-documentary evidence, even though a written or taped record of it was made. For example, payment may be proved without producing the written receipt which was given, e.g., through testimony of a party to the transaction. Similarly, earnings may be proved without producing books of account in which they are entered. *McCormick* § 198, 4 Wigmore § 1245. The Federal Advisory Committee states, however, that if the *event* is sought to be proved by the written or taped record, the Best Evidence Rule does apply and the original written or taped record must be used. *See* Notes of Advisory Committee on Proposed Rule 1002.

In this case, the State properly points to the fact that it was attempting to prove an event, i.e., the conversation. Under the Best Evidence Rule, the State had the *option* of proving the conversation (event) by offering the testimony of witnesses or by introducing the tapes. *See United States v. Gonzales-Benitez,* 537 F.2d 1051 (9th Cir.1976), *cert. den.,* 429 U.S. 923, 97 S.Ct. 323, 50 L.Ed.2d 291 (1976). However, once the State elected to prove the conversations through the recorded tapes rather than by the testimony of witnesses who heard the conversations, the State was obligated to introduce all of

the original tapes.[1] The following exchange is illustrative of the manner in which the transcripts of the tape recorded conversations were introduced at Atkins' trial.

> "Q. What is contained in State's for Identification B, please:
>
> A. This is a transcription of the meeting with Mary Scott, George Atkins and myself at Mary Scott's residence.
>
> Q. It starts out, 'Yo, Mary. Talk to this man.' Mr. Atkins is speaking?
>
> A. Yes.
>
> MS. BRADY: Your Honor, I would move its admission at this time.
>
> MR. ROBB: Your Honor, I would have the same objection under the best evidence rule to this other evidence of the original being put into evidence. Since the tape does exist, I think it is the best evidence.
>
> THE COURT: Miss Sherlock.
>
> MS. SHERLOCK: I have the same objection under the best evidence rule, Your Honor.
>
> THE COURT: The objections are overruled."

The testimony of the witness was not used to prove the conversation but was used to prove the accuracy of the transcription of the tape recorded conversation. The transcription was being offered as proof of the contents of the tape recording, i.e. the conversation. Under these circumstances, the State was obligated to introduce the original tape recording to prove its contents (the conversation). D.R.E. 1002.

If the contents of a tape recording are being proved, the original tapes must be offered into evidence. A different question arises when the original tapes *are* introduced into evidence and there is a request to *also* introduce transcripts of those tapes. Since Atkins will receive a new trial, we will address the evidentiary considerations that arise when both tape recordings and transcripts exist.

In a recent case, a defendant argued that the trial court abused its discretion by admitting into evidence transcripts of tape recordings *in addition* to the tape recordings themselves. *Van Arsdall v. State,* Del.Supr., 486 A.2d 1 (1984).[2] We held that there was no abuse of discretion. However, our holding in *Van Arsdall* should not be construed as approving the automatic simultaneous admission into evidence of an accurate transcript with the admission of a tape recording. In rejecting *Van Arsdall's* position, this Court cited *United States v. Turner,* 528 F.2d 143 (9th Cir. 1975), *cert. den.* 423 U.S. 966, 96 S.Ct. 426, 46 L.Ed.2d 371 (1975), and *United States v. Carson,* 464 F.2d 424 (2d Cir.1972), *cert. den.* 409 U.S. 949, 93 S.Ct. 268, 34 L.Ed.2d 219 (1972).

The *Turner* and the *Carson* decisions are instructive with respect to the competing considerations that come before a trial court when exercising its discretion to admit or exclude transcripts *in addition* to the tape recordings themselves.[3] The first concern which a trial court must address is the accuracy of the transcript. The second concern relates to what, if any, use may be made of the transcripts at trial.

In *Van Arsdall,* the parties agreed that the transcripts were fair and accurate.[4] 486 A.2d at 9. In *Turner* and *Carson,* the parties reached the same conclusion by equally acceptable alternate methods. In *Turner,* the Court found:

---

1. The proper foundation for the admission of a sound recording is set forth in 58 A.L.R.2d 1024, Admissibility of Sound Recordings in Evidence § 2, pp. 1027, 1028.

2. Compare *Gibbs v. State,* Del.Supr., 479 A.2d 266, 272 (1984) where composite tapes and transcripts were admitted pursuant to D.R.E. Rule 1006.

3. We do not address the admissibility of transcripts when the original tape recordings are lost or destroyed is governed by D.R.E. Rule

1004. See also *U.S. v. Maxwell,* 383 F.2d 437 (2d Cir.1967) *cert. den.* 389 U.S. 1057, 88 S.Ct. 809, 19 L.Ed.2d 856 (1967); *State v. Lewis,* Me. Supr., 373 A.2d 603 (1977); *State v. Goodwin,* 223 Kan. 257, 573 P.2d 999 (1977); *Wright v. Farmers Co-op of Arkansas and Oklahoma,* 681 F.2d 549 (8th Cir.1982).

4. The defense attorneys in this case disputed the accuracy of the tapes, having listened to them, but did not point to any specific discrepancies.

There can be no doubt that the transcripts were an accurate rendition of the contents of the tapes. The district judge, in the presence of defense counsel, methodically reviewed many of the tapes and corresponding transcripts to ensure their conformity. In doing so, the court made appropriate corrections in the transcripts, including changes requested by defense counsel, and then found these transcripts accurate as corrected. Thereafter, upon the court's suggestion that the government and defense meet out of court and attempt to stipulate to the accuracy of the remaining transcripts, all counsel agreed that Mr. Reichmann, the attorney for defendant Howard Lewis, would conduct a comparison of the tapes and transcripts, making any necessary corrections. Reichmann did so, and subsequently all counsel stipulated that the corrected transcripts were an accurate rendition of the contents of the tapes, and further, that the court reporter need not transcribe the conversations as played but instead could simply copy the corrected transcripts into the record.

*Turner*, 528 F.2d at 167.

In *Carson*, the Court found:

...An *in camera* hearing was later held, prior to the introduction of the tapes or transcripts into evidence, and three transcripts were made of the tapes. The parties agreed that the transcripts accurately reflected the words on the tapes, with certain exceptions as to which it was agreed that the transcripts would contain the version believed accurate by each party. The Government agreed with most of the changes sought by defense counsel, and on the most damaging tape, that of the December 29th meeting, agreed to delete certain words and substitute the word 'inaudible.' An explanation of how the tapes were made was given to the jury, and the tapes and transcripts were admitted; it is undisputed that the tapes played to the jury contained no deletions, splices or additions.

*Carson*, 464 F.2d at 437.

After the Court is satisfied with the accuracy of the transcripts, the Court must decide how the transcripts are to be used, if at all. It is well recognized that accurate typewritten transcripts of sound recordings, used *contemporaneously* with the introduction of the recordings into evidence are admissible to assist the jury in following the recordings while they are being played. *Turner*, 528 F.2d at 167. In fact, in *Turner*, the jury members were permitted to use the transcript as a "listening aid" in accordance with a carefully followed procedure.

...Before the playing of each of the taped conversations, each juror was given a copy of the appropriate corrected transcript. The transcripts were kept face down until the playing of the conversation had commenced and, at its conclusion, were immediately collected. In addition, the district court gave a cautionary instruction to the effect that only the recordings were evidence of the conversations; that the transcripts were provided merely to facilitate listening; and that each juror should, if he or she felt there was a difference between the two, "pay attention to [his or her] own senses and judgment as to what the recording does say."

Later, after the jury deliberations had begun, the jury requested by note that certain conversations be replayed, and several jurors asked in open court to use the transcripts during the replay. The court granted the request, following the same procedure as before, and again with the specific admonition that only the recordings, not the transcripts, were evidence of the conversations.

*Turner*, 528 F.2d at 167. (emphasis added).

In *Carson*, the Court went further than *Turner* and held that it was not an abuse of discretion for the trial court to admit the tapes and transcripts into evidence and to allow the jury to retain the transcripts during the trial and during their deliberations. *Carson*, 464 F.2d 424.

■■■ When original tape recordings are properly introduced into evidence, transcriptions of those recordings *may* also be received into evidence with the exercise of

judicial discretion. In the exercise of its discretion, the trial court should take into consideration the various factors that we have already outlined. Initially the Court must satisfy itself that the transcripts are accurate. In the absence of an agreement between the parties concerning the accuracy of the transcripts, the court may properly consider the use of transcripts that contain the version of the tape recording believed to be accurate by each party. *Id.*

■ The Court may also properly exercise its discretion in deciding how, if at all, the transcripts are to be used. We note that the use of accurate transcripts as a listening aid may often be helpful to jurors if the tape recording is long or difficult to hear. A court may permit the jury to retain the transcripts during the trial and their deliberations. However, the probative value of the retention of the transcripts during trial and during deliberations should be weighed against the normal prohibitions on cumulative evidence and improper emphasis.

■ If the transcripts are needed for any purpose, the jury must be carefully instructed concerning the use of the transcripts and must specifically be instructed that the tape recording and not the transcript is the evidence of the conversation. In both *Turner* and *Carson*, the instructions by the trial court to the jury were found to be particularly significant. At Atkins' trial, not only were the transcripts admitted instead of the tape recordings despite challenges to their accuracy, but no specific instructions concerning the use of the transcript were given to the jury.

When the State concluded its case, at least four separate transcripts had been introduced into evidence. The transcripts were received into evidence without the original tape recordings from which they were made, as independent evidence of the conversations reflected on the tape recordings. After the transcripts were introduced and received as independent evidence of the various conversations, the transcripts were used by the State for the purpose of examining its own witnesses directly and for an extensive cross-examination of the defendant Atkins when he testified in his own behalf. The use of the transcripts during Atkins' trial highlights the need for the exercise of judicial discretion even in circumstances when the admission of transcripts would be proper and the further need for the exercise of judicial control after the proper admission of transcripts. We find that it was contrary to D.R.E. 1002 to admit into evidence transcripts to prove the contents of tape recorded conversations in lieu of the original tape recordings which were in existence and available.

## TRANSCRIPTS AS DUPLICATE ORIGINALS OF TAPE RECORDINGS

■ A slightly different situation was presented when the State attempted to introduce a transcription of Mary Scott's tape recorded confession with certain portions having been deleted by the State. The State argued that the transcription of Mary Scott's tape recorded statement, with the deletions, could be received into evidence as a duplicate of her tape recorded statement. The Court's specific ruling was as follows:

"THE COURT: I have considered the objections as to the introduction of a duplicate of the statement with certain portions redacted by the state. I will take up separately any application for other portions of the document to be introduced into evidence and I will allow the State to introduce a duplicate in lieu of the original....

THE COURT: ...the witness has already testified that it accurately reflects the substance of her statement."

Once again, the State had the option of proving Mary Scott's confession through her trial testimony *or* by introducing the tape recorded statement. However, the State could not prove the statement by a transcript of the recorded statement even though the witness vouched for the accuracy of the transcript. If the State elected to prove the statement by the tape recording, it was obligated to introduce the original recording, not a transcript into evidence.

The transcript of the tape recorded statement could not be received into evidence as a duplicate.

> D.R.E. 1001(4) defines a duplicate as: A duplicate is a counterpart produced by the same impression as the original or from the same matrix ... or by mechanical or electronic re-recording ... or by other equivalent techniques which accurately reproduce the original.

To permit the edited transcript of Mary Scott's tape recorded statement to be received into evidence as "a duplicate in lieu of the original" tape recorded statement was contrary to D.R.E. 1001(4). *Wright v. Farmer's Co-op of Arkansas and Oklahoma*, 681 F.2d 549, 553, Note 3 (8th Cir. 1982).

## CONVERSATION BETWEEN POLICE DETECTIVE AND INFORMANT

■ Atkins' defense at trial was entrapment and is the focus of the next issue that he has raised on appeal. The United States Supreme Court established the availability of this defense in a federal prosecution in *Sorrells v. United States*, 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413 (1932). Likewise, the defense has been available in most states, including Delaware. *Halko v. State*, Del.Supr., 209 A.2d 895 (1965). The affirmative defense of entrapment is a matter of confession and avoidance. In effect, it concedes the commission of the act charged but claims it should not be punished because of the wrongdoing of the police officer. *Crosby v. State*, Del.Supr., 295 A.2d 708, 711 (1972). The defense of entrapment is specifically defined in the Delaware Code:

> In any prosecution for an offense, it is an affirmative defense that the accused engaged in the proscribed conduct because he was induced by a law-enforcement official or his agent who is acting in the knowing cooperation with such an official to engage in the proscribed conduct constituting such conduct which is a crime when such person is not otherwise disposed to do so. The defense of entrapment as defined by this Criminal Code concedes the commission of the act charged but claims that it should not be punished because of the wrongdoing of the officer originates the idea of the crime and then induces the other person to engage in conduct constituting such a crime when the other person is not otherwise disposed to do so.

11 *Del.C.* § 432(a)

■ We have previously held that the entrapment defense of § 432 is a factual question which is strictly within the province of the jury. *Harrison v. State*, Del. Supr., 442 A.2d 1377, 1385 (1982). As in the case of other affirmative defenses, the burden of proving entrapment rests upon the defendant. Cf. *Crosby v. State*, 295 A.2d at 711. The test for entrapment under the statute requires a jury to focus on the predisposition of the defendant and on the conduct of the government agent. In fact, the Atkins' jury was specifically instructed to that effect with respect to his defense of entrapment.[5]

In support of his entrapment defense, Atkins attempted to introduce the tape recording of a conversation between Detective Bullen and an alleged police informant. In response to the Court's request for an offer of proof with respect to the tape recording, Atkins' attorney replied:

> We are going to show there was a carefully orchestrated plan to trap Mr. Atkins. That Mr. Atkins did not approach the officer. That Mr. Atkins had no predisposition, no other involvement with selling drugs or using drugs and that there was a careful plan going on the phone lines between the warden's office or lieutenant's office in Gander Hill—and lieutenant Bullen's office when they

5. The charge to the Atkins' jury provided in part:

"The defendant George T. Atkins has asserted an affirmative defense in this case that he engaged in the conduct charged to constitute the defense because he was induced to do so by the conduct of a law enforcement official or the agent of a law enforcement official. This affirmative defense is known as entrapment. In order to establish the affirmative defense of entrapment, it is necessary for the defendant, George T. Atkins, to satisfy you by a preponderance of the evidence of both of the following elements ..."

were planning and orchestrating to get Atkins in the right position where they could get him arrested for delivery ...

The State objected to the introduction of the tape recording on the grounds that the alleged conversation was irrelevant and hearsay. Atkins' attorney responded to the State's objection at trial by asserting that the conversation was relevant to the defense of entrapment. Atkins' attorney also alleged that the tape recorded conversation was not hearsay because it was not being offered to prove the truth of the informant's statements but was being offered for the purpose of showing the effect of the informant's statements on the listener, Detective Bullen. The Court sustained the State's objection.

■ We will first address the relevancy of the tape recorded conversation between Detective Bullen and the informant. Relevancy is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." D.R.E. 401. In order to meet his burden in proving the defense of entrapment, Atkins needed to address the statutory requirement that "the wrongdoing of the officer originates the idea of the crime and then induces the other person to engage in conduct constituting such a crime." 11 *Del.C.* § 432(a). Moreover, the Atkins' jury was instructed that "after considering all of the evidence tending to support the existence of the defense, you (the jury) should determine whether that evidence makes it more likely than not that each element of the affirmative defense, as I have defined it for you, existed." If the tape recorded conversation tended to establish that the police officer originated the idea of the crime, it was relevant to Atkins entrapment defense since one of his statutory burdens was to establish that the officer originated the idea of the crime and then induced Atkins to commit it.

The State also argues that the conversation between Detective Bullen and the informant was too remote in time to be relevant. In *Harrison,* we were disturbed by

a test which confined the scope of the focus concerning the issue of predisposition to the time period "just before" the police solicited the defendant to participate in a criminal scheme. *Harrison v. State,* 442 A.2d at 1386. In fact, in *Harrison* we held that "the proper point of reference for ascertaining the predisposition of the defendant to commit a particular crime is the time period extending from just before the State's solicitation to just before the defendant's commission of the crime." *Id.* Bullen's contacts with Atkins took place over only five days. The origin of the crime and the inducement of Atkins were critical to his entrapment defense and were issues to be resolved by the jury after it heard all of the facts. The conversation between Bullen and the informant was not too remote in time to be relevant.

■ The second basis upon which the State objected to the introduction of the tape recording between Bullen and the informant was on the grounds of hearsay. Hearsay is defined as a "statement, other than one made by the declarant while testifying at the trial, offered in evidence to prove the truth of the matter asserted." D.R.E. 801(c). Atkins' attorney represented to the Court that the purpose of introducing the tape recorded conversation was not to prove the truth of the informant's statements but to prove the effect on Bullen, the listener. Specifically, Atkins wanted to prove that the effect of the informant's statement was to cause Bullen to originate the idea of the crime and to also cause Bullen to induce Atkins to engage in conduct constituting such a crime.

"Whenever an utterance is offered to evidence the *state of mind* which ensued in another person in consequence of the utterance, it is obvious that no assertive or testimonial use is sought to be made of it, and the utterance is, therefore, admissible, so far as the hearsay rule is concerned." (emphasis added). 6 *Wigmore Evidence* § 1789. This proposition is supported by *McCormick,* which gives an example that is analogous to the facts in this case:

When it is proved that D (informant) made a statement to X (Bullen) with the

purpose of showing the probable state of mind thereby induced in X (Bullen), ... to show the information which X (Bullen) had as bearing on the reasonableness or good faith or voluntariness of the subsequent conduct of X (Bullen). . . ., the evidence is not subject to attack as hearsay. *McCormick on Evidence*, § 249. (names added).

Atkins stated purpose for wanting to introduce the tape recording was to prove that the effect of the informant's words were to cause Bullen to originate the idea of a crime and then induce Atkins to commit it. The tape recording was not offered to prove the truthfulness of the informant's statements but to prove the effect of those words upon Bullen irrespective of their truthfulness.

This Court has previously held that it is proper to admit out of court statements when they are not offered to prove the truth of the matter asserted. *Whalen v. State*, Del.Supr., 434 A.2d 1346, 1355 (1981), *cert. den.* 455 U.S. 910, 102 S.Ct. 1258, 71 L.Ed.2d 449 (1982). In *Whalen*, such out-of-court statements were received to show why a detective believed the defendant was a suspect and were not intended to show that those statements were accurate. *Id.*

Our analysis is consistent with the conclusions that have been reached in other jurisdictions. Cf. *United States v. Herrera*, 600 F.2d 502 (5th Cir.1979); *Curreri v. International Brotherhood of Teamsters, Chauffeurs*, 722 F.2d 6 (1st Cir.1983). In *Herrera*, the Court concluded that a tape recorded telephone conversation between the defendant and another person was not hearsay and should be received into evidence because it was offered to show the defendant's state of mind as a consequence of the statements and was not being offered to prove the truth of the matter asserted. *Herrera*, 600 F.2d at 504. In *Curreri*, the Court was asked to exclude certain statements on the grounds of relevancy and hearsay. *Curreri*, 722 F.2d 6. The *Curreri* Court ruled that the statements were relevant and should not have been excluded on hearsay grounds because they were not offered to prove the truthfulness of the statements but were offered to help the jury assess the conduct of the union. *Id.* at 11. The *Curreri* Court concluded that the central issue in the case was the conduct of the union. *Id.* In this case, one of the central issues of the entrapment defense was the conduct of Detective Bullen.

We have previously held that a defendant is entitled to develop his defense of entrapment and that the hearsay rule may not be applied "mechanically" to defeat a right and the ends of justice. *Kreisher v. State*, Del.Supr., 303 A.2d 651 (1973). In *Kreisher*, the defendant wanted to introduce into evidence statements that had been made to him by an informant. *Id.* at 652. In particular, the defendant in *Kreisher* was attempting to testify as to the background and the circumstances prior to the crime. *Id.* This Court held that it would be fundamentally unfair to allow a hearsay objection to vitiate the defense of entrapment. *Id.* In *Kreisher*, the defendant was allowed to show the effect that an informant's statement had upon him. *Id.*

Atkins was also entitled to develop the background and the circumstances of the arrangements between Detective Bullen and the informant. The tape recording of the origin of the crime and the plan for inducing Atkins to commit it would be highly probative to Atkins' entrapment defense. *Lewis v. State*, Del.Supr., 416 A.2d 208, 210 (1980). Given the fact that the informant's statements to Bullen were admissible and not hearsay, the defendant had the option of presenting those statements through Bullen's testimony or by introducing the tape recordings into evidence. The tape of the conversation between Detective Bullen and the informant was the most reliable evidence possible of the conversation in which the government's own agent was a participant. *See Lopez v. United States*, 373 U.S. 427, 83 S.Ct. 1381, 10 L.Ed.2d 462, *reh. den.*, 375 U.S. 870, 84 S.Ct. 26, 11 L.Ed.2d 99 (1963).

## JURY CHARGE

██ Following the Court's charge to the jury, Atkins' attorney took exception to

those portions of the charge making Atkins criminally liable for the conduct of another and also to those portions of the charge relating to Atkins' involvement in a conspiracy. In particular, Atkins' alleged that the failure to repeatedly identify Scott in the jury instructions as the person who Atkins aided (in the case of his vicarious liability) and as the person with whom he had to conspire, created the possibility of confusion. Atkins' alleged that the jury might have thought aiding or conspiring with Detective Bullen would have made Atkins guilty of the offenses charged.

The indictment which was read as part of the jury instruction clearly identifies Scott as the person whom Atkins aided and with whom Atkins is alleged to have conspired. A trial judge is given substantial latitude in tailoring jury instructions as long as those instructions fairly and adequately cover the issues presented. In considering an alleged insufficiency in instruction, the charge to the jury must be viewed as a whole. We have considered the defendant's argument in light of the trial court's entire charge and conclude that his argument is without merit. Cf. *Jenkins v. State*, 305 A.2d 610 (1973). However, since we have concluded that Atkins should receive a new trial, it is a matter which may once again be addressed to the trial court's discretion when the next jury charge is formulated.

### SEVERANCE

Atkins' final argument is that joining his trial and the trial of his co-defendant, Brokenbrough, was prejudicial to him. Brokenbrough's conviction has recently been affirmed by this Court. In view of the requirement for a new trial, this argument is moot.

### CONCLUSION

The convictions of George Atkins are REVERSED and this cause is REMANDED for proceedings consistent herewith.